670 F.Supp. 1145 (1987)
Ricardo DOE, by his next friend Elizabeth JOHANNS; and Richard Roe, by his next friend James T. Ratner, individually and on behalf of all other persons similarly situated, Plaintiffs,
v.
The NEW YORK CITY DEPARTMENT OF SOCIAL SERVICES; George Gross, individually and as Administrator of the New York City Human Resources Administration and as Commissioner of the New York City Department of Social Services; and Eric Brettschneider, individually and as Assistant Administrator of Special Services for Children, Defendants.
No. 86 Civ. 4011 (MJL).
United States District Court, S.D. New York.
September 24, 1987.
*1146 Lenore Gittis, Janet R. Fink, The Legal Aid Society, Juvenile Rights Div., by Rose E. Firestein, Jane M. Sufian, New York City, for plaintiffs.
Peter L. Zimroth, Corp. Counsel of the City of New York by Frederick P. Schaffer, Antonia Levine, Allan M. Schlesinger, Daniel Turbow, Gwyneth Murphy, New York City, for defendants.

MEMORANDUM OPINION AND ORDER
LOWE, District Judge.
This case is about the substantive due process rights of children whose family is the City of New York because their parents either aren't permitted to continue custody or voluntarily surrender it. The children involved in this lawsuit are repeatedly kept in city offices during the day, don't know where they will sleep at night and carry their possessions from place to place in plastic garbage bags. The central legal question for this court's decision is whether the city can constitutionally maintain such a system of overnight foster care "placement" which results in the city's continued *1147 ability to remove children from their homes without having other homes for them.

BACKGROUND

PROCEDURAL HISTORY
Named plaintiffs Ricardo Doe and Richard Roe (pseudonyms) are foster care children who have been placed into the custody of the Commissioner (the "Commissioner") of the New York City Department of Social Services ("DSS") by the New York Family Court. On May 20, 1986, plaintiffs brought suit against three defendants: DSS; George Gross ("Gross"), Commissioner of DSS; and Eric Brettschneider ("Brettschneider"), Assistant Administrator of Special Services for Children ("SSC"), a division of DSS (collectively, the "City"). Gross and Brettschneider are sued in their official and individual capacities.
Immediately upon filing their complaint, plaintiffs moved for a preliminary injunction and class certification under Fed.R. Civ.P. Rules 65 and 23(b)(2), respectively (the "First Motion").
Plaintiffs sought to represent:
all children who are in the care and custody of the Commissioner because they are alleged or were adjudicated to have been neglected or abused or to be PINS [Persons in Need of Supervision], are alleged to be juvenile delinquents, or were voluntarily placed in foster care, and who have been, are being, or will be held at a field office of SSC without a current placement in a certified, licensed or approved foster family home or in an authorized agency boarding home, group home or public institution for children either past 7:00 p.m. or on more than one day.
(Complaint, ¶ 7). In essence, plaintiffs sued on behalf of children who were regularly held in DSS field offices during the day, transported at night to child care facilities or SSC's office of Emergency Services for Children ("ECS") to sleep, and returned to the field offices the next morning to await another overnight placement.
In their First Motion for injunctive relief, plaintiffs primarily challenged the City's practice of exposing them to repeated "overnights" as a violation of their due process rights under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. Plaintiffs asserted that detention in field offices meant deprivation of proper nutritional, medical and educational supervision, treatment and care. Plaintiffs also contended that the defendants' alleged failure to provide notice to parents, when their children were held in field offices, constituted a violation of their procedural due process rights. Plaintiffs also claimed various violations of New York State's Constitution, laws and regulations.
Plaintiffs sought an order which would (1) require the defendants to develop additional approved foster care settings; (2) limit the amount of time children would spend in field offices waiting for a place to sleep; (3) ensure access to appropriate education; (4) ensure that children are provided with adequate food, recreation, exercise, clean clothing, and supervision; (5) ensure that infants received special care; and (6) require defendants to notify the childrens' parents, law guardian or attorney if they are being held at a field office.
Following plaintiffs' First Motion, this court held a scheduling conference at which plaintiffs' request for expedited discovery was granted and a hearing date scheduled. On June 26, 1986, plaintiffs amended their complaint as of right in order to delete one pendent state claim.
From July 14 through July 18, 1986, the court conducted a hearing on the issue of plaintiffs' entitlement to injunctive relief (the "July Hearing"). Appreciating the need for extensive factual inquiry to resolve that issue and in view of the potentially mandatory nature of the requested relief, the court reserved the task of fashioning a remedy until the entitlement question was resolved.[1]
*1148 Ten witnesses testified at the preliminary injunction hearing, producing a transcript of more than 700 pages. In addition to the testimony of SSC caseworkers, placement or "allocations" workers, and SSC supervisory or training staff, the court heard testimony from six expert medical or psychiatric specialists who were particularly familiar with the needs of children, the foster care system and, what some have called, the "night-to-night" program. In addition to the testimony, the parties submitted numerous affidavits and the complete court and social services records of fourteen children alleged to be typical of those subjected to repeated overnight placement. At the court's request, plaintiffs also furnished the court with the results of a computer analysis of data obtained during discovery relating to the numbers and characteristics of children who have been frequently placed on an overnight basis.
On the eve of this court's decision on plaintiffs' entitlement to preliminary relief, the parties entered into a "First Interim Stipulation and Order of Settlement" (the "Interim Settlement Agreement"). The Interim Settlement Agreement was approved by this court on July 30, 1986.
With respect to class certification, the parties agreed that the action would proceed as a class action "on behalf of all children in foster care who have had or will have three successive overnight placements or two failed placements within a three-month period." (Interim Settlement Agreement, ¶ 12).
Regarding plaintiffs' application for preliminary relief, the Interim Settlement Agreement provided a short-term solution to the inadequacies of the "night-to-night" program. It called for the improvement of the facilities and services available in SSC field offices. More specifically, the Interim Settlement Agreement addressed the inadequacy of the food, medical care, toilet facilities, outdoor recreation, and education at the field offices as well as nursery space at the Bronx field office. The Interim Settlement Agreement also established a system whereby class members would be referred to a designated SSC employee for review and recommendation as to how a stable placement could be obtained for the child.
The Interim Settlement Agreement further established a procedure and timetable for reaching a second agreement, expected to focus on elimination of the longer-term causes of overnight placements. The parties envisioned a negotiated plan to eliminate the shortage of foster care placements, diagnostic facilities and psychiatric services. The Interim Settlement Agreement stated that if unresolved issues remained regarding such a plan, plaintiffs could "by motion on or before September 15, 1986 submit to the Court questions of defendants' liability and unresolved issues regarding the plan." (Interim Settlement Agreement, ¶ 10(c)).
The parties were not able to agree on a plan for the development of foster care placements. As a result, on September 15, 1986, plaintiff class filed a renewed motion for preliminary injunction (the "Renewed Motion").
In its Renewed Motion, the plaintiff class challenges defendants' practices of: (1) "placing" class members in overnight "placements" on three successive occasions or after a failed placement because an appropriate stable or diagnostic placement was not available, (2) failing to ensure that the children have adequate and clean clothing, and (3) failing to ensure that the children have a daily opportunity to bathe. As was the First Motion, the Renewed Motion is based upon alleged violations of the Due Process Clause of the Constitution's Fourteenth Amendment, 42 U.S.C. § 1983, the New York State Constitution, state statutes and regulations.
Plaintiffs seek a detailed mandatory injunction which, among other things, would require defendants to (1) keep, or encourage voluntary agencies to keep, children in temporary but stable placements (i.e. through the payment of premiums) until a permanent stable placement could be found; (2) produce a foster bed development plan that would obviate the need to *1149 place children in overnight "placements" more than three successive times or after a failed placement or to use congregate care for children under ten; (3) provide day care to foster parents of young children; (4) provide out-patient diagnostic services and counseling; and (5) create a computerized vacancy control system.
Through August 24, 1987, the plaintiff class filed a series of affidavits in support of its Renewed Motion. The affidavits reported on the defendants' continued overnight placement practices and the children who have been affected by those practices. In addition, plaintiffs' affidavits have identified several other allegedly objectionable practices which the defendants have adopted in order to avoid housing children on an overnight basis. Those other practices include: (1) placing foster children in unlicensed congregate care facilities; (2) placing foster children under ten years old in congregate care facilities and children under twelve years old in institutions, without individualized determinations concerning the child's need for care in a congregate or institutional setting; (3) placing young children and adolescents in the same foster care facilities; and (4) overcrowding congregate care facilities (collectively, the "Additional Practices").
Plaintiffs have taken the position that their action, as it was originally filed, encompasses the Additional Practices. They contend that the essence of this case has always been plaintiffs' claimed entitlement to stable and appropriate placements immediately upon entry into foster care. Plaintiffs argue, therefore, that their original complaint covers any allegedly unconstitutional practice that defendants devise to cope with the insufficiency of such placements. Defendants, however, have consistently maintained that the instant lawsuit is addressed to the legality of the instability of repeated overnight "placements," not the propriety of otherwise stable placements. That dispute has resulted in extensive motion practice.
On March 25, 1987, plaintiffs filed an "addendum" to their Renewed Motion in which plaintiffs request that the court order the City to open ten additional Agency Operated Boarding Homes ("AOBH")[2] each month until certain conditions are met. Those conditions include the placement of children (1) no more than three times within two months; (2) in licensed, certified or approved foster boarding homes which (a) are not overcrowded, and (b) do not simultaneously house children under ten years old and adolescents. Plaintiffs would also have the court require that no child under the age of ten be placed in a congregate care facility unless an individualized determination has been made regarding the child's need for such care.
On March 25, the plaintiff class filed a motion under Fed.R.Civ.P. 15(d) for leave to supplement its complaint to incorporate the Additional Practices (the "Motion to Supplement"). The class seeks leave to make a series of allegations that form the basis of a proposed fifth claim for relief from the Additional Practices. (Proposed Supplemental Amended Complaint, ¶¶ 2a, 20a, 23a, 35a, 35b, 36a, 40a, 41a). In its new fifth claim, the class asserts that the Additional Practices violate the Due Process Clause of the Fourteenth Amendment to the Constitution, 42 U.S.C. § 1983, the New York State Constitution and various New York State statutes and regulations. (Proposed Supplemental Amended Complaint, ¶ 57). The class also wishes to enlarge its prayer for relief. It requests a declaratory judgment on its proposed fifth claim. (Proposed Supplemental Amended Complaint, ¶ C.1a). It additionally seeks a preliminary and permanent injunction requiring defendants to ensure that congregate facilities do not exceed their licensed capacities, are authorized to care for children with the characteristics of the children placed with them, have an adequate number of beds, and do not simultaneously house young children and adolescents. (Proposed Supplemental Amended Complaint, ¶ D.1a). The class also asks that a *1150 preliminary and permanent injunction be entered requiring defendants to comply with state regulatory standards prior to placing children under ten years old in congregate care and children under twelve in institutions. (Proposed Supplemental Amended Complaint, ¶ D.1b).
As a result of the parties' disagreement over the nature and scope of this action, they were also unable to resolve certain discovery disputes. The defendants refused to produce subpoenaed documents on certain topics and objected to questions directed at a designated witness on those topics. On April 8, 1987, plaintiffs filed a motion to compel discovery pertaining to four main issues: (1) whether congregate care facilities are overcrowded and what effect overcrowding has had on the children; (2) whether the conditions in congregate care facilities are hazardous to children under ten years of age who are placed in those facilities; (3) whether the bed-development plan adopted by defendants is adequate to meet the projected need for foster beds and whether defendants are taking the steps reasonably necessary to implement the plan; and (4) what placement decisions were made concerning certain children outside of the class and whether these decisions were made using professional judgment (the "Motion to Compel").
On July 14, 1987, plaintiffs moved to redefine the certified class. Plaintiffs seek to include "all children who are or will be in foster care with the New York City Commissioner of Social Services and who are not placed appropriately immediately upon entry into foster care because of the lack of an adequate number of appropriate foster care settings." (Plaintiffs' Memorandum of Law in Support of Second Motion for Preliminary Injunction and Amended Class Certification ("Pl. Br. on Second Motion"), p. 23).
At the same time, plaintiffs filed a second motion for a preliminary injunction (the "Second Motion") on behalf of the proposed redefined class.[3] The Second Motion focussed on the defendants' "patterns, practices, customs and policies of placing plaintiffs at the East Harlem Reception Center ["East Harlem"], a facility that is not licensed for the foster care of children, that is not approved for congregate care for children under 10 years old, and that is overcrowded and unsafe." (Plaintiffs' Notice of Motion for Second Preliminary Injunction and for Amended Class Certification ("Pl. Notice on Second Motion"), p. 2). Plaintiffs again alleged that the City had violated the Due Process Clause of the Fourteenth Amendment. They asked the court to order the City to close East Harlem and place the children currently housed there in "appropriate, authorized and licensed" foster care. (Pl. Notice on Second Motion, pp. 1-2).
After establishing a briefing schedule, this court notified the parties that an evidentiary hearing on the status of and conditions at East Harlem would begin on Monday, August 10, 1987.
On Friday, August 7, 1987, the defendants informed plaintiffs and this court that the City had agreed to comply with the State Department of Social Service's ("SDSS") order to close East Harlem down.[4] More specifically, the City agreed *1151 to stop placing children at the facility and to find new placements for the 22 children who were then staying at East Harlem. Eight non-handicapped children would be moved by August 15, 1987. The remaining 14 handicapped children would be removed to an SDSS licensed facility by August 31, 1987. The court accordingly cancelled the August 10 hearing.
Plaintiffs have not, however, entered into a stipulation of settlement on, or withdrawn their Second Motion. The plaintiffs object to the defendants' failure to commit to locating "proper" placements for the handicapped children or guarantee that East Harlem will never be reopened. Plaintiffs ask the court to hold the Second Motion in abeyance until they can determine whether the City has provided meaningful relief under its agreement with SDSS. If the handicapped children are not placed in "appropriate facilities or boarding homes," plaintiffs intend to request that the court "recalendar their motion and permit plaintiffs to present evidence that the handicapped children were subjected to unconstitutional conditions at East Harlem and that their replacement has not rectified that situation." (Plaintiffs' Statement of Outstanding Issues, p. 14; see also Plaintiffs' Reply to Defendants' Statement of Outstanding Issues, p. 4).

The Children and the Night-to-Night Program

An Overview
The children who have been shuffled from place to place on the overnight program fall into four statutory classifications. They are: (1) children who are alleged or adjudicated to be neglected[5] or abused[6] and were remanded to the Commissioner's custody; (2) children who are alleged or adjudicated to be a Person in Need of Supervision (PINS)[7] and remanded to the Commissioner's custody; (3) children who are alleged to be juvenile delinquents (JD)[8] and are remanded to the Commissioner pending trial; and (4) children who have been voluntarily placed in the Commissioner's custody by their parents or guardians.[9]
*1152 The treatment of these children, whether they be abused, neglected, PINS, JDs or voluntarily placed, is the result of the policies and practices developed by SSC over at least the last two and one-half years. Although defendant Brettschneider took exception to the characterization of the system of overnight "placements" as a "program", (Tr., p. 518), the record reveals that is precisely what it has become.
As is evidenced by the SSC records submitted to the court, once a child is placed in the Commissioner's custody, a placement at an authorized foster care facility should be located. There are two main types of foster care facilities: (1) "voluntary agencies" which contract with DSS to receive foster children and which may reject children who fall outside their contractual criteria; and (2) direct care agencies run by DSS itself. In addition, there are several categories of foster care facilities, which are defined by state regulations as follows:
Foster Boarding Homes:
Foster Family Home Care:
Care provided to a child in a certified or approved foster home pursuant to requirements of state regulations. 18 N.Y.C.R.R. § 433 (McKinney's 1983).
Congregate Care:
Agency Operated Boarding Home:
A family-type home for the care and maintenance of not more than six children. It is operated by an authorized agency in quarters owned, leased or otherwise controlled by such agency. The home may provide care for more than six brothers and sisters of the same family. There are no restrictions on the age of children who can be placed in this type of home. 18 N.Y.C. R.R. § 441.2(i) (McKinney's).
Group Home:
A family-type home for the care and maintenance of not less than seven, nor more than 12 children over the age of five. The home is operated by an authorized agency in quarters owned, leased, or otherwise controlled by that agency. The minimum age is not applicable to siblings placed in the same facility. An individualized determination must be made regarding placement of children under ten at a group home. 18 N.Y.C.R.R. § 441.2(h) (McKinney's).
Group Residence:
An institution for the care and maintenance of not more than 25 children operated by an authorized agency. The age restrictions applicable to group homes also govern placements in group residences. 18 N.Y.C.R.R. § 441.2(s) (McKinney's 1983).
Institution:
Any facility for the care and maintenance of 13 or more children operated by a child care agency. Individualized determinations are required for placement of children under twelve. 18 N.Y.C.R.R. § 441.2(f) (McKinney's).
Diagnostic Reception Center
A facility in which children can be placed to have their special needs assessed. There is no limitation on the size of the facility.
SSC allocations workers are responsible for locating placements for the children while they wait in field offices in each of the five boroughs.[10] If a "regular" or stable placement cannot be found, allocations workers try to obtain an overnight "placement" for the child. (Tr., pp. 79-81). After an overnight "placement," children are returned to the field offices the next day to wait for another stable or overnight "placement." (Tr., p. 81). Each time a child gets a new overnight "placement," he or she spends some portion of the day in an SSC field office. (Tr., pp. 83-84).
If an overnight "placement" cannot be located by 5:00 p.m., workers in SSC's Placement Division, who are assigned on a rotating basis to night coverage, attempt to *1153 find what one supervisor called a "rest stop," for the child. (Tr., pp. 223-25). If no beds can be found, an attempt may be made to identify a place for the child to sleep by consulting the availability of "Commissioner access beds." (Tr., p. 228). "Commissioner access beds" are "extra beds" that SSC developed in conjunction with the voluntary foster care agencies and the City's direct care program. (Tr., p. 547).
If no place for the child to sleep can be found by 10:00 p.m., children from all the borough field offices are sent to the ECS office in Manhattan where they sleep overnight. ECS is open on a 24 hour basis because children come into the system all night long as a result of emergency removals. (Tr., p. 228).
At this court's July Hearing, defendant Brettschneider testified that he attempted to eliminate the practice of having children sleep at ECS beginning in March 1985. (Tr., p. 660). He was, however, unsuccessful. Elizabeth Mayberry ("Mayberry"), Administrative Director of the SSC's Office of Field Services and the Office of Placement and Accountability, testified that she believed that seven children slept at ECS in March and thirteen in April 1986. (Tr., p. 247). SSC statistics indicate that between May 5 and June 11, 1986, 38 or 40 children slept at the ECS office. (Pl.Ex. 85). At the July 1986 hearing, defendants' witnesses represented that children no longer sleep at the ECS office and that they hadn't for the past month.
The practice has, however, continued. In June 1986, SSC expanded the number of rooms used for sleeping at ECS. (Tr., p. 304). According to SSC's daily placement lists, at least 16 children spent the night in the ECS office during an 18 day period in February 1987. (Affidavit of Rose E. Firestein dated March 10, 1987 ("March 10, 1987 Firestein Aff."), p. 4; Affidavit of Victoria B. Elsberg dated March 10, 1987 ("March 10, 1987 Elsberg Aff.,") pp. 12-13). On July 16, 1987, three children apparently slept at the ECS office. Two of those children suffered from conjunctivitis. The other, a four month old infant, had Sudden Infant Death Syndrome. (Affidavit of Victoria B. Elsberg dated August 21, 1987 ("August 21, 1987 Elsberg Aff."), p. 14). As recently as July 28, 1987, two more children stayed at the ECS office overnight. (August 21, 1987 Elsberg Aff., p. 14).
The number of children exposed to overnights at ECS pales in comparison with those who have endured the overnight experience in general. At the time of the July 1986 hearing, defendant Brettschneider estimated that three to four hundred children had already been subjected to the overnight program. (Tr., p. 519).[11] The defendants calculated that in the months immediately preceding the hearing, the number of children on repeated overnights ("placed" three or more times) were as follows: March  79; April  81; May  103. Plaintiffs initially estimated that "the number of potential class members subject to the challenged policies and practices of defendants ... is at least 49 every weekday." (Affidavit of Jane Sufian ("Sufian Aff."), ¶ 13; Pl.Ex. A attached thereto). The defendants themselves stated that "each day ... the field offices of SSC are filled with as many as 30 or more of these young people waiting to move from place to place on a nightly basis." (Proposal for the Door Program, Def.Ex. 4 to Brettschneider Aff., p. 2).[12]
*1154 It appears that more children have been forced to endure repeated overnights since the July 1986 hearing than prior to that time. Plaintiffs' analysis indicates that the number of children who have been moved from place to place on overnights at least three times per month are as follows:

 1986
 July: 117
 August: 201
 September: 132
 October: 187
 November: 192
 December: 189
 1987
 January: 200
 February: 246
 March: 390
 April: 375
 May: 275
 June: 315

(Affidavit of Victoria B. Elsberg dated January 30, 1987 ("January 30, 1987 Elsberg Aff."), ¶ 7, Table I; March 10, 1987 Elsberg Aff., ¶ 7, Table I; August 21, 1987 Elsberg Aff., ¶ 11, Table I). Between May 1986 and July 1987, several children experienced one "placement" after another for extended periods of time. At least one child had more than 65 "placements." Almost one thousand children had between five and nine "placements." (August 21, 1987 Elsberg Aff., ¶ 14, Table III).
Some children had periods in which they were "placed" almost daily. (August 21, 1987 Elsberg Aff., ¶ 13, Table II; March 10, 1987 Elsberg Aff., ¶ 10, Table IV; January 30, 1987 Elsberg Aff., ¶ 10, Table IV). They were repeatedly "placed" in the same or alternating facilities though they spent their days in the field offices. (August 21, 1987 Elsberg Aff., ¶ 19, Table V; March 10, 1987 Elsberg Aff., ¶ 15, Table VII; January 30, 1987 Elsberg Aff., ¶ 12, Table V).
While the numbers presented above are important, nothing is more instructive than the individual stories of the children for whom entering foster care has virtually meant joining the ranks of New York's homeless. The parties have presented this court with a tremendous amount of descriptive and technical information concerning the lives of fourteen children who were repeatedly subject to overnight "placements" and days in field offices. In addition, those children were the subject of extensive testimony at the July 1986 hearing. Their stories follow.

Individual Children
Children who enter foster care have, by definition, experienced major trauma. Repeat overnighters have had even more than their share of trouble before entering the system. The testimony and submissions uniformly indicate that they come to the Commissioner with disproportionately serious medical, psychological, emotional and behavioral problems. The record also reflects that once in the system, they are subject to the most stress and receive the least care. The childrens' histories are divided below according to statutory classification.[13] Pseudonyms have been used.[14]

Abused and Neglected Children:

Ricardo
Ricardo ("Ricky") Doe is a thirteen year old Hispanic child who has been in and out of the foster care system since August 1985. He and his twelve year old sister, Lizette, were first voluntarily placed by their uncle. The children had previously been staying with their stepfather, who had allegedly sexually abused Lizette.
For the month of August 1985, the children were placed at Abbott House. (Plaintiffs' Hearing Exhibit ("Pl.Ex.") 14, A-9). While there, Ricky was described as having behavioral problems. In September 1985, he was discharged into the custody of his natural father, who took the child to Pennsylvania. (Pl.Ex. 15, F-68).
Ricky later returned to New York with his father and, on December 11, 1985, had his next encounter with foster care. At *1155 that time, Ricky's father filed a petition to place him in the custody of the Kings County Family Court as a PINS. The PINS petition alleged that Ricky did not respond to his father's commands, was disrespectful of his elders, and had disappeared from home for the last four days. (Pl.Ex. 13, A-4).
On December 17, the Family Court remanded Ricky to DSS for temporary care. (Pl.Ex. 13, F-38). Ricky was placed at the Queensboro Society for Prevention of Cruelty to Children. (Pl.Ex. 15, F-40). Six days later, he was placed at the Williamsburg Reception Center, where he remained until February 1986. (Pl.Ex. 15, F-33).
While at Williamsburg, Ricky underwent two psychological examinations. The examiners found that Ricky has an above average non-verbal capacity and an average verbal capacity. His actual reading ability was substantially below capacity. (Pl.Ex. 14, A-17). One of the examiners described Ricky as moderately depressed, and having a "slightly nightmarish" mood, primarily as a result of his confused family situation. (Pl.Ex. 14, A-18). The examiners concluded that "considerable work" needed to be done with Ricky before he could be returned to his family, and that he should remain on his current placement until further evaluation of his needs could be made. (Pl.Ex. 14, A-18, 21).
There is no record that any further evaluation of Ricky's needs was conducted. Instead, Ricky was discharged and placed at Lakeside School from February 18 to April 10, 1986. According to the records, Ricky demonstrated that he was a good student who should remain in an education program, though he was acting self-destructively and was deliberately disobeying rules. On April 10, however, Lakeside returned Ricky to the Family Court at his request. Lakeside then refused to take Ricky back. (Pl.Ex. 15, F-37, 82).
April 10, 1986, Ricky was placed at St. John's, another child agency, without the knowledge of his parents, who could not be located. (Pl.Ex. 15, F-18, 85). The failure of Ricky's parents to visit or contact their son resulted in SSC's decision to file a neglect petition against them on April 29, 1986. In the neglect petition, the caseworker characterized Ricky's mental condition as "impaired or ... in imminent danger of becoming impaired." (Pl.Ex. 15, F-61-62). The next day, Ricky was discharged from St. John's and replaced by SSC. (Pl.Ex. 15, F-51). By the end of April, Ricky had been placed at six different foster care facilities and returned home once.
Beginning in early May 1986, Ricky began his experience as an overnighter. On May 2, Ricky was rejected by six group facilities, including St. John's, which characterized him as "manipulative." (Pl.Ex. 14, A-27-29). On May 8,[15] he was assigned overnight to Baychester and presumably spent the day in an SSC field office. Baychester was followed by a weekend at the Marolla Group Home ("Marolla") in the Bronx. (Pl.Ex. 14, A-30). Ricky was returned to the Brooklyn SSC field office on May 12, were he repeatedly spent his afternoons while subject to the night-to-night program. (Pl.Ex. 14, A-31). The next night, Marolla refused to take Ricky back, stating that he had been smoking crack while at that facility. He was accepted that evening by the Mission of the Immaculate Virgin ("MIV") infirmary on Staten Island, where he remained for nine days. On May 22, Ricky was taken back to Family Court and again remanded to SSC. (Pl.Ex. 14, A-32). Ricky was again "placed" on June 27, 1986 and July 29, 1986. (Affidavit of Carolyn A. Johnson dated August 24, 1987 ("Johnson Aff."), p. 3).
During Ricky's more than one month experience on overnights, no attempt was made to keep him in touch with any part of his family, including his sister, who was in foster care in Brooklyn. (Hearing Transcript ("Tr."), p. 139) Nor is there any indication that the evaluations and recommendations of the examining psychiatrists were followed or even considered. After his series of multiple overnight "placements," *1156 Ricky was characterized as "confused, highly disruptive, depressed and acting out." (Tr., p. 453).

Richard
Richard Roe is eleven years old. He is Black. He came to Family Court for the first time on April 16, 1986 in Bronx County.[16] Richard's mother filed a PINS petition on that day in which she alleged that Richard was habitually truant and disobedient, frequently returned home after curfew, and sometimes not at all, and was generally beyond parental control. (Pl.Ex. 18, F-1).
Richard was adjudicated to be a PINS and was remanded to the Commissioner for temporary care. (Pl.Ex. 17, A-2). Later that day, he was remanded to the St. Mary of the Angels Home ("St. Mary's"), where he remained for two weeks until he was again remanded to the Commissioner. (Pl.Ex. 17, A-4, 6). At that time, no physical or mental problems were indicated. (Pl.Ex. 17, A-5).
From April 30 until May 12, 1986, Richard was subjected to repeated overnight "placements." He spent his days in SSC's Bronx field office, without any evaluation or other programming. (Affidavit of Rose Firestein dated May 19, 1986 ("Firestein May 19, 1986 Aff."), p. 2). He was sent out to various overnight shelters, sometimes without an evening meal. (Firestein May 19, 1986 Aff., p. 2). On May 2, Richard was referred to an overnight shelter in Pleasantville, New York, after being turned down by six other facilities. His overnight placement was switched three more times in the next eight days. (Pl.Ex. 17, A-7-8).
On May 12, 1986, the Bronx Family Court ordered that the child not be returned to Abbott House, where he'd slept the previous night. Richard was then accepted by the MIV Drumgoole Diagnostic Unit. On May 13, however, when he arrived there, that facility also rejected him. (Pl.Ex. 17, A-12). On May 19, Richard was rejected for re-intake by St. John's because of "unmanageable behavior." He was assigned to Marolla on overnights for the next three days. (Pl.Ex. 17, A-15). On May 22, the Family Court dropped Richard's PINS determination and he was remanded to SSC as a neglected child. (Pl.Ex. 18, F-53-54). On May 23, after another Family Court remand, Richard was sent to the Brunner facility after eleven shelters refused to care for him. During the next five days he was "replaced" two more times. (Pl.Ex. 17, A-14-15). On June 3 and June 4, Richard had two more "placements." (Johnson Aff., p. 3). The record does not reveal where Richard was from June 4 until June 9.
Richard was finally remanded to the Pleasantville Diagnostic Center on June 9, 1986. (Pl.Ex. 18, F-56). We have no report of a change in Richard's placement since that time.

Faith
Faith Koe, who is twelve years old and Black, was first brought to SSC's attention on November 20, 1985, when she was the subject of a report of child abuse or maltreatment. She suffers from asthma, epilepsy, and chlamydia, a sexually transmitted disease requiring vaginal penetration. (Pl.Ex. 24, F-2-4).
On December 9, 1985, Faith was remanded to SSC's custody because she allegedly threatened her mother with a knife. Jacobi Hospital refused to admit her because they determined she was not psychotic. (Pl.Ex. 23, A-3). During the next four nights, she was sent to two different overnight facilities, Evergreen and Theriot, after being rejected by as many as twelve facilities per night. Those shelters refused to take Faith for reasons ranging from behavior problems to her age. (Pl.Ex. 23, A-4, 5). On December 13, 1985, foster care placement was discontinued because a relative agreed to take responsibility for Faith. (Pl.Ex. 23, A-6).
On February 11, 1986, yet another report of suspected child abuse was filed about *1157 Faith. In the three days prior to the report, Faith had broken a door in her aunt's home, and had attempted suicide by overdosing on Tegretol, an anti-seizure medication. Tegretol had been prescribed for Faith on her previous period in SSC's care. Faith went to Jacobi Hospital by herself. Her mother did not accompany her. (Pl.Ex. 24, F-25-26).
On February 15, 1986, a doctor at Jacobi Psychiatric Unit requested that Faith be placed in foster care because she would be in imminent danger if returned home. He concluded that she was socially aggressive, especially at home, but that she usually improved outside the household. As a result, Faith was placed, on an overnight basis, at the Hageman Center. (Pl.Ex. 24, F-25-31). There is no record of where Faith was placed between February 15 and March 21, 1986.
On February 26, 1986, Faith's mother filed a PINS petition alleging that Faith was sexually active and beyond her control. (Pl.Ex. 22, A-1). As a result, Faith was remanded by the Bronx Family Court as a PINS child for temporary care on March 21 of this year. (Pl.Ex. 24, F-45).
Faith was placed that night at the Hageman Center. The next day she left. She went home, which resulted in another family crisis. (Pl.Ex. 24, F-47). On April 8, Faith was again remanded to the Commissioner's care. (Pl.Ex. 24, F-50).
Over the course of the next week, SSC sent Faith to three different centers on an overnight basis.[17] (Pl.Ex. 23, A-17). She spent her days at the Bronx field office. Because Faith was not receiving care, Faith's mother  who had herself been accused of neglecting her child  removed Faith from the office and brought her home on numerous occasions, despite the problems that would occur. (Affidavit of Burt Grayman dated May 9, 1986 ("Grayman Aff."), p. 2).
Between April 18 and April 29, 1986, Faith was sent to Geller House. Geller House, however, refused to keep her because she was "verbally and sexually provocative." Geller House recommended that Faith be placed in a psychiatric hospital. (Pl.Ex. 23, A-19-21).
Faith, however, was not placed in a psychiatric hospital. (Pl.Ex. 23, A-19-21). Instead, the Commissioner put her in Laconia Group Home. Faith promptly disappeared. (Pl.Ex. 24, F-53). Though the record is unclear, Faith was apparently at home for the next two weeks. She returned to the field office on May 13 and was disruptive. (Pl.Ex. 25, F-54). Nevertheless, Faith continued to spend her weekday afternoons at the field office for the next two weeks. Her mental condition grew worse. (Pl.Ex. 24, F-53-56).
On May 15, 1986, Faith's caseworker wrote that he felt powerless to help her. (Pl.Ex. 24, F-55). By May 27, the record reflects that Faith was "depressed and fearful" of going to the Elmhurst Group Home overnight due to problems there in the past. (Pl.Ex. 24, F-56).
Between May 13 and June 3, Faith was placed in five different group homes on overnights and rejected by many others. (Pl.Ex. 24, F-54-58). As was her pattern, Faith ran away on June 3, 1986 and was not seen again until June 9. The Commissioner again sent her on an overnight. (Pl.Ex. 24, F-58).
On June 11, Faith was examined at Jacobi Hospital, where a doctor concluded that Faith's major problems were behavioral in nature, involving "aggression and undersocialization." He recommended placement in a "correctional facility"[18] to help her gain control of the massive amount of "rage within her." (Pl.Ex. 24, F-59). This recommendation went unheeded as well. From June 11 until August 5, 1986, Faith was "placed" 11 times. (Johnson Aff., p. 4).
Dr. William Kaplan testified extensively regarding Faith's history. Having reviewed her record, he concluded that Faith's deep mental and physical problems made her a poor candidate for the overnight *1158 program as far back of February 1986. (Tr., pp. 391-93). Dr. Shepherd, who also testified about Faith, noted that no ongoing provisions were made for her physical needs, as well as the administration of her medication. (Tr., pp. 675-676). Dr. Kaplan predicted that continued exposure to repeated overnight "placements" would cause further deterioration of Faith's emotional state. According to Dr. Kaplan, Faith needed to be placed in a "psychiatric facility that [was] locked for diagnostic observation." (Tr., p. 394).

Takeesha
Takeesha Boe is an eight year old who has been the subject of SSC investigation since she was a one year old because of reports that she was beaten and abandoned by her parents. (Pl.Ex. 27, F-1, 16, 36, 37).[19] In May 1984, a report of suspected child abuse accusing Takeesha's mother of failing to take proper care of the child, was found to be "indicated." (Pl.Ex. 27, F-65).[20]
In November 1985, a report was filed by the social worker at Takeesha's school, stating that the child came to school smelling of urine and with scratches on her face. She was apparently afraid of her mother, who was suspected of having a drinking problem. Takeesha's mother appeared intoxicated at her daughter's school on November 21, 1985. (Pl.Ex. 27, F-77, 78).
Takeesha's file contains a note which she wrote at school sometime in January 1986. The note reads: "I will kill myself by rahning [running] away, hanh [hang] myself or [illegible]." On January 21, as a result of that note, an appointment was made for Takeesha at the Columbia Presbyterian Psychiatric Depression Clinic. The appointment was never followed through. (Pl.Ex. 25, pp. 3-4). More suicide notes were found at school in a notebook on January 30. (Pl.Ex. 27, F-123). That same day, a report was filed by a school guidance counselor stating that the child was bruised from being kicked by her father. (Pl.Ex. 27, F-98). A neglect petition was then filed. Takeesha was remanded to the Commissioner for temporary custody. (Pl.Ex. 25, p. 8).
From January 30 until February 24, 1986, Takeesha was placed in six different facilities. She spent the night of January 30 on an overnight to the St. Christopher-Janice Clarkson Foster Home. The next day, the foster mother requested Takeesha's removal because she smelled. (Pl.Ex. 26, A-2). She spent the next five days at the Little Flower Foster Home. Little Flower also refused to keep her, complaining that she was disruptive. (Pl.Ex. 26, A-3).
Takeesha spent the next two weeks, until February 19, 1986, at Abbott House, where a psychiatric evaluation was conducted. The report stated that the child had been verbally and sexually provocative during her time at the facility and had willingly engaged in oral sex with her fifteen year old roommate. (Pl.Ex. 26, A-5).[21] The report recommended that Takeesha be placed in a "therapeutic residential setting able to provide both a therapeutic milieu and intensive psychiatric and psychotherapeutic services for younger children ASAP." (Pl.Ex. 26, A-6).
Takeesha spent the next six days at the SSC field office, with no provision for education or recreation. (Affidavit of Elizabeth Stuart Calvert dated May 19, 1986 ("Calvert Aff."), p. 3). On February 20, 1986, she stayed at Evergreen; on February 21 she was at the 85th Street Home. (Pl.Ex. 26, A-12, 13). There is no record of where Takeesha spent her nights on February 22 and 23.
*1159 On February 24, 1986, Takeesha was finally sent to St. Agatha's, a well-regarded diagnostic center. She stayed at St. Agatha's until April 28. (Calvert Aff., p. 3). The psychiatric evaluation performed at St. Agatha's concluded that Takeesha had a great deal of potential and needed full psychological testing, therapeutic intervention and "exposure to a sustaining environment" in order to develop this potential. (Pl.Ex. 27, F-152-156). In her three months at St. Agatha's, Takeesha's mental attitude seems to have improved markedly. At the time of the hearing before this court, one expert characterized Takeesha's behavior and mental outlook as stabilized, and showing "remarkable progress over a short period of time." (Tr., p. 445).
As of June 18, 1986, Takeesha was placed in Graham-Windham Residential Center. She has been characterized as having made "some adjustments" there. (Pl.Ex. 27, F-216-17). She has apparently had no further placements. (Johnson Aff., p. 5).

John
John Goe is seventeen years old and Hispanic. From ages five through thirteen, John was in foster care. At age thirteen he was returned to his mother's custody. (Affidavit of Diane Tukman dated May 19, 1986 ("Tukman Aff."), p. 3). At age fourteen, John reentered the foster care system and was placed for one year in a group home in Puerto Rico. (Tukman Aff., p. 3). On January 11, 1984, John was placed by ECS at the Drumgoole Diagnostic Unit of MIV. (Calvert Aff., p. 3).
On February 9, 1984, SSC filed a neglect petition on John with the Family Court. SSC charged that John's mother failed to supply adequate food, shelter and clothing; and exposed him to excessive corporal punishment and abandonment. (Pl.Ex. 36, F-2).[22] On March 19, 1984, the Family Court ordered placement of John and his three brothers with the Commissioner for 18 months. (Pl.Ex. 36, F-4).
For over one year, John was placed in the Baychester Diagnostic Reception Center. John's overall cognitive functioning was at a slightly higher level at the end of this period. His level of intellectual functioning moved from "moderately" to "mildly" deficient. John's "personality dynamics" were described as "very primative adolescent," confused, impulsive, mildly provocative, with minimal intellectual abilities. John was also evaluated as needing continued residential support for at least another year. (Pl.Ex. 36, F-209-11).
John, however, was not permitted to stay at Baychester. On June 3, 1985, John embarked on the first of a series of multiple "placements." He went first to the Franklin Manor Group Home of the Episcopal Mission Society. (Pl.Ex. 36, F-230). Only three weeks after his reassignment, a psychiatrist reported that John's negative behavioral characteristics were "certainly magnified" since Baychester. (Pl.Ex. 36, F-263). Because John had disobeyed the rules at the Episcopal Mission Society, including stealing other residents' belongings, the doctor "strongly recommended" that John be returned to Baychester.[23] (Pl.Ex. 36, F-263-264).
On June 28, 1985, the Episcopal Mission Society transferred John to MIV. He was then transported to SSC's Bronx field office the following Monday. (Pl.Ex. 35, A-10). Between June 28 and July 4, 1985, the record is unclear as to where John was placed.
During July 1985, John was subjected to a series of overnights as follows:
July 5: Arverne (for the weekend). (Pl.Ex. 35, A-12).
July 8: Assigned to Atlantic, but John did not go to Atlantic because he said he believed children were beaten there. (Pl.Ex. 35, A-13).
July 11: Arverne (overnight). (Pl.Ex. 35, A-14).

*1160 July 12: John was sent back to the Bronx field office and was once again sent to Arverne overnight. (Pl.Ex. 35, A-15).
July 13: No Record.
July 14: No Record.
July 15: John was again returned to the Bronx field office and was sent to the McDougal Diagnostic Center overnight. (Pl.Ex. 35, A-16).
July 17: John went AWOL from McDougal and returned to the Bronx field office. He was then sent to Atlantic. (Pl.Ex. 35, A-17).
July 18: No Record.
July 19: No Record.
July 20: No Record.
July 21: No Record.
July 22: John was back at the Bronx field office and was again sent to Atlantic. (Pl.Ex. 35, A-17-18).
August 9: St. John's. (Pl.Ex. 36, F-309).
Aug. 13: John is "placed" at Queens SPCC because a Bronx Family Court judge ordered that SSC "replace" the child. (Pl.Ex. 36, F-265).
While at the Queens SPCC, John received another psychosocial evaluation. The doctor recommended that John be placed in a group home that is not too large. The doctor reported that John had "some inner resources and strength, however, without this support [at a smaller group home] he will become more despairing and could be potentially suicidal." (Pl.Ex. 36, F-291).
On September 13, 1985, John was again transferred to Arverne. He was immediately "discharged" because he made a pass at a female worker. (Pl.Ex. 35, A-18). During the month of October 1985, John was placed with the following agencies:
Oct. 18: MIV (for the weekend). (Pl.Ex. 35, A-21).
Oct. 21: Arverne (overnight). (Pl.Ex. 35, A-21).
Oct. 22: McDougal Diagnostic Center accepted John, but he went AWOL. The record states that John made "threats to staff-disrespectful-threatened with rape." (Pl.Ex. 35, A-22-23).
Oct. 24: Arverne (overnight). (Pl.Ex. 35, A-23).
Oct. 28: Atlantic (Pl.Ex. 35, A-24).
Oct. 30: N.Y. Catholic Guardian Group Home. (Pl.Ex. 35, A-25).[24]
While John was at Catholic Guardian, another psychological examination was performed. The report that resulted stated that "there is evidence that neurological impairment has had a negative impact on John's functioning." Examination further revealed that John was "very vulnerable to regression in an unstructured situation." (Pl.Ex. 36, F-313, 314). John remained at Catholic Guardian. On February 20, 1986, however, another Report of Suspected Child Abuse or Maltreatment was filed  this time against a Catholic Guardian Group Home supervisor. The Report alleged that the Group Home supervisor physically threw John out of the Group Home in his underwear, causing "finger marks (red welts)" under his right armpit. (Pl.Ex. 36, F-342). The marks were observed by another Catholic Guardian worker. Despite the incident and the report, John remained at Catholic Guardian for another month.
On March 10, 1986, John was once again condemned to repeated overnights and brief placements in different facilities.
March 10: Brunner Group Home. (Tukman Aff., p. 5).
March 11: John was placed at MIV but did not want to go there and went AWOL. (Pl.Ex. 35, A-27).
March 12: John was "In Service" requesting placement. (Pl.Ex. 35, A-27).[25]

*1161 March 13: Baychester accepted John for an overnight. (Pl.Ex. 35, A-28, 29).
March 14: Marolla Group Home. (Pl.Ex. 35, A-29).
March 20: Brunner for an overnight. (Pl.Ex. 35, A-29).
March 21: Holland Group Home until March 24. (Pl.Ex. 35, A-30).
March 26: McDougal accepted John but he refused to go saying he would be hurt there. (Pl.Ex. 35, A-31). No record of where John spent the night.
March 27: Atlantic for the weekend. (Pl.Ex. 35, A-31).
March 31: Baychester, where, after an overnight, he was not picked up and was reported as being "loud and abrasive, demands placement other than McDougal or Baychester." (Pl.Ex. 35, A-32, 33).[26]
April 2: Atlantic overnight. (Pl.Ex. 35, A-33).
April 4: Baychester for the weekend. (Pl.Ex. 35, A-32).
April 7: McDougal on overnights until April 10. (Pl.Ex. 35, A-35, 36).
April 11: Theriot rejected John but was later ordered to accept him for an overnight by the Division Director. (Pl.Ex. 35, A-36, 37).
April 14: John was in the Bronx field office awaiting "replacement." Atlantic finally accepted him. (Pl.Ex. 35, A-37, 38).
May 5: John walked into the ECS office and asked for a placement. He was sent to the Promesa Group Home. (Pl.Ex. 36, F-369-370).
May 6: John was discharged from Atlantic. (Pl.Ex. 36, F-371).
May 13: John was "placed" at St. Mary's of the Angels until May 14. (Tukman Aff., p. 5).
May 18: John was "placed" overnight and returned to the field office in the morning. (Pl.Ex. 36, F-376).
May 19: John showed up at the field office. No placement was found, so he spent the night at ECS. (Pl.Ex. 36, F-377).
May 21: John walked into ECS at 11:10 p.m. and said he had to leave McDougal due to problems with other residents, after which John's bed was given to another child. (Pl.Ex. 36, F-378-386).
John's days and nights continued to be spent without any stable place to go. John began continually appearing at all hours of the night in the Emergency Adult Unit ("EAU") located in the same building as ECS. (Pl.Ex. 36, F-384-87). McDougal ultimately gave John's bed to another child permanently. (Pl.Ex. 36, F-386). From August 1986 through May 1987, John was "placed" at least 29 additional times. (Johnson Aff., pp. 4-5). Eleven of those "placements" occurred during April 1987 alone. (Johnson Aff., pp. 4-5).
John himself summarized his situation best. On July 15, 1986, a call was received from Creedmoor's adult facility where John's mother was being kept. The facility social workers stated that John was at Creedmoor, sleeping on the sofa in the lounge. They reported that John said that he was homeless. (Pl.Ex. 36, F-367).

PINS Children:

Felix
Felix Moe is sixteen years old and Hispanic. On June 17, 1985, Felix was adjudicated to be a PINS child. He was remanded to SSC after a determination that he had left school "never to return." (Pl.Ex. 21, F-20, 40).
Felix was sent overnight to the Arverne Group Home on June 18, 1985. (Pl.Ex. 20, A-5). Felix was then sent to the MIV infirmary. He was placed at MIV's Doris Street Group Home, but went AWOL on July 25. (Pl.Ex. 21, F-26-27). He was discharged to his mother on July 30. SSC apparently did not care for him again until January 1986. (Pl.Ex. 21, F-61, 64).
In the six month period that he was out of the Commissioner's custody, Felix was not controlled by his parents. Felix was in Puerto Rico during the summer. He had *1162 to be returned to New York because he was "out of control." (Pl.Ex. 21, F-41). He was found living in the subways in September, suffering from pneumonia and bronchitis, but left the hospital in which he was subsequently placed. (Pl.Ex. 21, F-32-33, 42-43).
Felix was finally remanded to SSC on January 13, 1986. (Pl.Ex. 21, F-70). He then began his odyssey in the overnight program, which continued for almost four months.
In psychiatric examinations which took place during the month of January 1986, Felix's problem was diagnosed as primarily attributable to his poor home life. He was not found to be psychotic, nor was he suffering from any other mental disorder. The recommendation at that time was that Felix remain in his present placement at St. John's, where he had apparently gotten along well. The examining physician also recommended that Felix receive further psychological evaluation and follow-up guidance. (Pl.Ex. 21, F-87).
Contrary to the psychiatrist's recommendations, Felix was subjected to overnight placements from January through April 1986. On each weekday he was returned to the Bedford Avenue SSC field office in Brooklyn. (Affidavit of Wilson Arnes dated May 19, 1986 ("Arnes Aff."), p. 1). Felix apparently spent enough time in school to be suspended by Manhattan High School on March 12 for allegedly attempting to assault a principal. (Pl.Ex. 21, F-110). Otherwise, no services or treatment were provided to Felix. In the 92 day period between January 10 and April 11, Felix was placed 36 separate times at 11 different facilities. (Arnes Aff., p. 3).
SSC records concerning Felix during his near four month sojourn in the overnight program evidence physical and mental deterioration. Felix was hospitalized from February 12 until February 18, 1986, and again on March 5 overnight, due to an asthmatic condition. (Pl.Ex. 20, A-18, 22). Dr. Levitt testified that Felix's behavioral patterns were getting worse. He exhibited signs of deterioration, including fights, anti-social behavior; and the beginnings of drug abuse and criminal activity. (Tr., pp. 133-137).[27] According to Dr. Levitt, Felix's experiences will likely cause him to lose all faith and confidence in adults. (Tr., p. 136-137). Felix was, in Dr. Kaplan's opinion, a "poor candidate" for the night-to-night program and is in desperate need of a highly structured environment. (Tr., p. 453-454).
The negative change in Felix's behavior became so extreme that by March 18, 1986, when the Kings County Family Court once again remanded Felix to the Commissioner's custody, the court pleaded: "Please stop moving [Felix] from place to place with frequent changes." (Pl.Ex. 19, F-111).
Upon the Commissioner's resumption of custody, Felix was sent to the MacDougal facility for overnight "placement." (Pl.Ex. 20, A-28). On March 19, he was sent to Brunner for the night, and returned to the SSC field office the next morning. (Pl.Ex. 20, A-26). The next day, March 20, Felix was sent to the Holland Group Home and again returned to the field office the next morning. (Pl.Ex. 20, A-26, 27). On March 21, Felix was sent to MIV for the weekend. He was returned to the field office on Monday, March 24, 1986. (Pl.Ex. 20, A-27).
On April 10, 1986, the Marolla Group Home refused to take Felix back, after having had him on overnights at least five times before. (Arnes Aff., p. 3). Marolla refused him because he was "deteriorating" due to the continual overnight "placements." (Pl.Ex. 20, A-34). Felix was instead sent to the Brunner Group Home, from which he had apparently gone AWOL just three nights before. (Pl.Ex. 21, F-2, 7). The record does not contain information about Felix's placement from April 21 to June 6. On that date, he was sent to the Atlantic Diagnostic Center. He disappeared *1163 that same night. (Pl.Ex. 21, F-8). Our information on Felix ends there.

Tanya
Fourteen year old Tanya Poe has been in SSC's custody since December 18, 1985 when she was found to be a PINS by the Bronx Family Court. Tanya's mother alleged that Tanya refused to obey her commands and that she had been away from home for the prior week. (Pl.Ex. 43, p. 1). On that date, Tanya was "placed" at the Euphrasia Residence for diagnostic testing. The record contains no clinical report or indication that any testing actually took place. (Pl.Ex. 44, A-1, 9). For three months, Tanya was shuttled from shelter to shelter. (Pl.Ex. 44, A-1-7).
Between March 25 and April 19, 1985, Tanya was on overnights at MIV in Staten Island. (Pl.Ex. 44, A-4). During this period, Tanya spent her afternoons at the Bronx SSC office. She missed meals on several occasions as a result of SSC's transportation schedule between the office and her overnight "placement." (Firestein May 19, 1986 Aff., p. 3). She was given no schooling. Nor did she have the opportunity to engage in organized recreational programs. (Firestein May 19, 1986 Aff., p. 3). MIV administered a blood test, and on April 18 Tanya tested positive for pregnancy. (Pl.Ex. 44, A-5). As a result, Tanya could no longer stay at MIV. She was sent to the Rosalie Hall facility. (Pl.Ex. 45, F-11, 12).
There is no record of Tanya's placement between April 22 and May 13, 1986, when Tanya was remanded to SSC for the fourth time. She was "placed" in the New York Foundling Hospital and arrangements were finally made for a diagnostic examination at the Lakeside Center. (Pl.Ex. 45, F-15, 16). As of the court's hearing, Tanya's diagnostic evaluation had not yet been conducted. We have no record of further placements.

Diane
Diane Noe, nine years old and Black, was adopted by her present parents when she was four years old. Before entering the foster care system in 1986, Diane had a history of stealing from her classmates in the various schools which she had attended on Long Island. (Pl.Ex. 39, F-45-46).
In November 1984, Diane began running away from home and made allegations of child abuse against her parents, which were later shown to be unfounded. (Pl.Ex. 39, F-46). Eventually Diane was placed in a temporary foster home in West Islip and later in a "permanent" home in Wyandanch. Diane could not adjust to her placement and, by February 1985, was back with her parents. In October 1985 Diane moved to Brooklyn with her parents. (Pl.Ex. 39, F-47).
On December 10, 1985, Diane claimed to have been abandoned by her father when he went to pick her up after school. (Pl.Ex. 39, F-2). SSC investigated the allegation and concluded that it was unfounded. The investigation revealed that Diane had run away and caused her family stress. Diane's mother desired residential placements for Diane because she feared for the child's safety. The mother stated that Diane needed constant supervision and daily therapy. (Pl.Ex. 39, F-12).
On January 16, 1986, Diane's mother filed a PINS petition. She alleged that Diane was AWOL from home for extended periods, that she stayed out late, that she was late for school and that she stole from her classmates. (Pl.Ex. 37, p. 1). In response to the petition, the Kings County Family Court remanded Diane to the Commissioner for a diagnostic examination at the Family Reception Center ("FRC") from January 30 until March 24, 1986. (Pl.Ex. 37, p. 3).
While at the FRC, a diagnostic was done on Diane. The results indicated that she was a "seriously emotionally disturbed girl whose parents are overwhelmed." (Pl.Ex. 39, F-48). The examination also showed that Diane did not get along with her peers and that she alienated others when trying to make friends. (Pl.Ex. 39, F-47). Diane was diagnosed as having a borderline personality disorder. (Pl.Ex. 39, F-53). The tests also revealed that Diane's problems were a result of early developmental problems and lifetime experiences of loss and *1164 change. (Pl.Ex. 39, F-50). The recommendation was that Diane be placed in a residential treatment facility where she would receive therapy and that her parents receive family counseling. (Pl.Ex. 39, F-55-57). The doctors also noted that Diane needed a "very special educational setting." (Pl.Ex. 39, F-57).
On March 24, 1986, Diane appeared in court for a disposition of her case. The Family Court judge remanded Diane to the Commissioner for therapeutic placement. Diane's parents refused to take Diane home while awaiting permanent placement. (Pl.Ex. 37, p. 2). Consequently, Diane began her experience with overnight "placements."
From March 25 to March 27, 1986, Diane stayed at an unspecified field office during the day and at unspecified overnight "placement" sites. (Pl.Ex. 38, A-4, 5). She was taken home by her parents until April 1, 1986. From April 1 to April 17, Diane again spent her days in unspecified field offices and was subject to overnights at various facilities. On April 16, no overnight location could be found for Diane and she was forced to sleep at the ECS office. (Pl.Ex. 38, A-8, 10, 11-16, 19; Pl.Ex. 39, F-66-70; Pl.Ex. 84).
On April 10, 1986, Diane was evaluated by SSC as part of a referral for long term placement. She was found to be kind and friendly. Additionally, however, she was suspected of being a fire setter. (Pl.Ex. 39, F-70-71).
On April 17, 1986, a regular placement was found for Diane at Ashford. She was assigned to remain there until a Residential Treatment Center ("RTC") could be located for her. (Pl.Ex. 38, A-19, 20).
On April 23, 1986, Diane returned to the Kings County Family Court. At that time, her parents agreed to keep her at home until an RTC could be found for her. The court accordingly released Diane to her parents until May 21, 1986. (Pl.Ex. 37, p. 2). On that date, the Family Court once again sent her home with her parents until July 2, 1986. (Pl.Ex. 37, p. 2).
On May 26, 1986, Diane was found by her father standing naked in the lobby of her building. She had been there for an hour. A child abuse report was filed anonymously. Diane alleged that her mother had gotten angry at her and made her do it. (Pl.Ex. 39, F-73, 74). The following day, however, during an investigation, Diane admitted that her mother had not made her stand naked in the lobby. It was also discovered that Diane was on the waiting list at Astor House. (Pl.Ex. 39, F-73-77).
Although the dates are unspecified, records show that Diane spent an overnight placement at SSC's West 85th Street Group Home and then returned to the Brooklyn field office. The 85th Street Group Home rejected Diane for permanent placement because while there she had set a fire and they "already had too many fire setters at that facility." (Pl.Ex. 38, A-32, 33). Records also show that on another occasion Diane was taken to ECS for emergency "placement." A "placement" was finally located at Market Street. (Pl.Ex. 39, F-81).
Diane appeared in Kings County Family Court on July 2, 1986. By that time, more than three months after the Family Court had ordered that she be placed at an RTC for therapy, Diane was finally accepted at Federwaeld. Diane's parents, however, found the facility unacceptable. The Family Court again released Diane to her parents until September 15, 1986. (Pl.Ex. 37, p. 4). We have no record of further placements. (Johnson Aff., p. 5).

Victor
Victor Coe is a thirteen year old Black child. He was abused by his mother and lived with his father after 1977, when the Family Court awarded his father custody. (Pl.Ex. 33, F-1). On March 27, 1985, Victor's father died from complications resulting from drug abuse. (Pl.Ex. 33, F-2). Approximately one month later, Victor's uncle petitioned for guardianship. (Pl.Ex. 33, F-3-4). Two weeks later his case was assigned to SSC for an investigation on the guardianship petition.
At the same time, Victor's uncle apparently filed a PINS petition in Brooklyn *1165 Family Court.[28] Victor's uncle alleged that the child had fights in school, ran away from home for a three day period and stole from another child at school. (Pl.Ex. 33, F-10). Victor was returned home after being hit by a car while he was riding a bicycle on President Franklin Delano Roosevelt Drive at night. The court found that Victor had "absconded from home," adjudged him a person in need of supervision and remanded him to the Commissioner for an investigation and report, a mental health study and an exploration of placement. (Pl.Ex. 32, A-1).
From the time of the Family Court's initial remand on November 18, 1985 until he was voluntarily placed at Kings County Hospital on March 15, 1986, Victor was "placed" at approximately seven different facilities, transferred to and from different facilities on nine occasions and spent approximately five nights in single overnight or weekend "placements."[29]
Victor was originally placed by the Family Court at St. Christopher's Group Home, where he stayed for one month. St. Christopher's refused to allow Victor to continue at the group home, claiming that he was very disturbed and uncontrollable. (Pl.Ex. 32, A-2). On December 19, 1985, Victor was remanded to SSC without any specific court instructions. SSC then placed him at MIV, where he remained for about two months. (Pl.Ex. 32, A-3). On February 19, 1986, the court discovered that Victor was receiving Haldol (a potent anti-psychotic drug) four times a day. (Pl.Ex. 32, A-3). The Family Court then ordered that Victor be placed at a facility other than MIV. (Pl.Ex. 31, p. 3). Victor then became an overnighter. Between February 19 and approximately March 15, 1986, Victor was "placed" on an overnight basis and spent his days in SSC field offices.
The experts who testified about Victor concluded that SSC did not make any special arrangements for Victor's treatment or supervision following the prescription of Haldol to this thirteen year old child.[30] The experts could not determine whether Haldol had been administered to Victor due to a psychosis or simply for management purposes. (Tr., p. 398). In any case, Dr. Kaplan stated, even if Haldol was properly prescribed and administered, Victor should not have been subjected to multiple changes in his life while undergoing such treatment. (Tr., p. 398).
On March 17, 1986, Victor was discharged from the Atlantic Diagnostic Center and placed at Kings County Hospital. (Pl.Ex. 33, F-36). On April 22, the PINS petition was withdrawn and a voluntary placement agreement was signed placing Victor at Kings County Hospital. (Pl.Ex. 31, p. 5). On June 1, Victor was again admitted to the Atlantic Diagnostic Center. (Pl.Ex. 33, F-36). Victor was placed at least one more time  on July 1, 1986. (Johnson Aff., p. 5). The reasons for the transfers are not stated in SSC's records.

Adea
Adea Quo is thirteen years old and Black. On March 3, 1986, she was picked up at a private home by the police on a report of suspected child abuse. (Pl.Ex. 48, *1166 F-1). SSC investigated and found that Adea had been a chronic runaway since September 1985. Her mother was reportedly not upset by Adea's running away because she "never spent any time with her daughter anyway." (Pl.Ex. 48, F-3, 17, 25).
On March 4, 1986, Adea's mother filed a PINS petition with the Queens County Family Court. Adea was released to her parents and the disposition was adjourned to March 20, 1986. (Pl.Ex. 48, F-21, 28).
Following the adjournment, the child ran away from home several times. She was found once by a neighbor who reported that Adea was living in the streets. (Pl.Ex. 48, F-21, 27, 31). The investigation further showed that Adea hated her stepfather for the way he treated her mother and that he made sexual advances toward her. (Pl.Ex. 48, F-18, 21). She stated that she could not stay home because of her stepfather. (Pl.Ex. 48, F-18). Adea was also reputed to have been sleeping on the roof with men. (Pl.Ex. 48, F-22).
On April 2, 1986, Adea's mother had a baby after a high risk pregnancy. (Pl.Ex. 48, F-30, 36). The following day, Adea's stepfather died and her mother became severely depressed. (Pl.Ex. 48, F-37, 38).
On May 6, 1986, Adea's mother filed another PINS petition on Adea. She alleged truancy, chronic disobedience, and destructiveness. (Pl.Ex. 46, p. 2). While SSC field office records do not indicate an overnight on May 7, the transportation log does. (Pl.Ex. 84). On May 8, Adea was returned to the Queens County Family Court on a warrant. The Court remanded her to the Commissioner for shelter care with a disposition set for May 14, 1986. (Pl.Ex. 48, F-51). Adea spent the remainder of the day in the "transportation room" maintained by the Commissioner at the courthouse. (Affidavit of Carol Hochberg dated May 19, 1986 ("Hochberg Aff."), p. 1).
Adea was "placed" on overnights at the Little Flower Group Home on May 8, 9 and 12. On May 12, Adea was transported to the Queens SSC field office where she waited to be placed. (Hochberg Aff., p. 2). Adea later ran away from the Queens field office. (Pl.Ex. 46, p. 4). A warrant was issued for her arrest by the Queens County Family Court on May 14, 1986. (Pl.Ex. 46, p. 4). Apparently, the child was found sometime that day, as she was assigned to Ashford for an overnight on May 15. (Pl.Ex. 48, F-41).
On May 16, Adea returned to the Queens County Family Court and was again remanded to the Commissioner for shelter care. (Pl.Ex. 46, p. 11). She was placed in the Queensboro Diagnostic Center later that day for a diagnostic workup. (Pl.Ex. 47, A-4). There is, however, no record of Adea actually undergoing a diagnostic examination at Queensboro. Adea was then scheduled for an overnight at Ashford. (Pl.Ex. 48, F-67). She never made it to Ashford, however, because she ran away from the Queens Society for Prevention of Cruelty to Children ("QSPCC"). (Pl.Ex. 48, F-71).[31] The record, therefore, does not reveal where Adea was on May 16, 1986.
Another warrant for Adea's arrest was issued by the Queens County Family Court on May 17, 1986. Adea was again apparently located because she appeared in court on May 23. Adea was remanded to the Commissioner's care and the case was adjourned until July 3, 1986. (Pl.Ex. 46, p. 16). Later on May 23, Adea was accepted at the QSPCC until her next court date. (Pl.Ex. 47, A-6). She remained at QSPCC until May 27, when she again went AWOL. The following day, another warrant was issued for her arrest. (Pl.Ex. 46, p. 7). Finally, on June 3, 1986, SSC discharged Adea "to AWOL." (Pl.Ex. 48, F-73). The last report on Adea was that she had once again absconded from the Commissioner's courthouse "transportation room" on July 10, 1986. (Pl.Ex. 46, p. 17; Johnson Aff., p. 5).

Nicole
Nicole Voe is a thirteen year old child whose case was first referred to the Bronx Family Court on January 3, 1986. Nicole's mother alleged in her PINS petition that *1167 her daughter had been truant, habitually late and disrespectful at home. (Pl.Ex. 83, p. 8).
On January 23, 1986, the PINS petition was voluntarily dismissed upon Nicole's agreement to attend school and refrain from violating the law. (Pl.Ex. 83, p. 9). On February 27, a petition of violation of the terms of the dismissal was filed. (Pl.Ex. 83, p. 10). A similar petition was filed on May 9 of this year. (Pl.Ex. 83, p. 11). This court has been unable to trace Nicole's location during January and February since the defendants failed to provide Nicole's field office and allocations file. The Family Court file indicates that Nicole was in the custody of her maternal grandmother on March 6, 1986. (Pl.Ex. 83, p. 13).
On May 13, 1986, the Family Court held a hearing on Nicole's case. The child was remanded to the custody of SSC until May 15. Nicole's mother was shown a newspaper article which stated that remanded children spent evenings at SSC field offices. Within an hour, Nicole's mother changed her mind about her PINS petition and insisted on bringing her daughter home. (Affidavit of Jerry Gruen dated May 19, 1986 ("Gruen Aff."), p. 2). Two days later, the parties reported that they had settled their differences. The petition was then dismissed. (Gruen Aff., p. 2). The only additional information available to the court relating to Nicole indicates that she was again "placed," apparently on overnights, on November 5 and 6, 1986. (Johnson Aff., p. 5).

Pedro
Pedro Hoe, who is 14 years old, was born in Puerto Rico. He has 9 siblings. He does not, however, know where most of his siblings are because his mother gave up their care to different people. After Pedro's mother and father died in Puerto Rico, Pedro lived with his grandmother until she died.
Pedro then migrated to New York City, where he lived with his aunt for three years. Pedro complained that his aunt was very strict with him, subjecting him to corporal punishment. The aunt alleged that Pedro was a discipline problem, had a poor school record, stole money and ran away. Pedro's aunt stated that she could not control him. Pedro's aunt had him evaluated by mental health workers, who did not find any problem with Pedro.
Pedro's sister Maria then housed him to allegedly prevent his aunt from beating Pedro. Pedro shared a bedroom with two of Maria's three sons, ages three, five and six. Pedro molested all three of Maria's children. (Pl.Ex. 30, F-1).
On April 21, 1986, Maria filed a petition against Pedro. The Family Court remanded Pedro to the Commissioner for temporary care on April 22, pending a fact finding hearing. Pedro is also an alleged felony juvenile delinquent. (Pl.Ex. 29, A-2-4).
Dr. Shepherd testified about the problems in Pedro's early childhood. His inability to develop a solid relationship with his mother has manifested itself in aggressive behavior, most of it taking the form of sexual acting out. Dr. Shepherd stated that a child like Pedro is one of the most vulnerable children, having experienced the least stable or protective environment. She concluded that Pedro would need as much protection as possible in the context of foster care. (Tr., pp. 677-679).
On April 22, 1986, Pedro was sent to the Brunner Group Home on an overnight. He returned to the SSC Bronx field office the next morning. On April 23, Pedro again went to Brunner for an overnight. Although he asked to stay at Brunner because he liked it there, he was told that he had to return to the field office on April 25. (Pl.Ex. 29, A-6). In order to avoid having to leave Brunner, Pedro hid for several hours at the agency, almost leading to a warrant being issued. Pedro was permitted to return to Brunner for the weekend.
On April 28, 1986, MIV rejected Pedro "for sexually acting out." St. John's also rejected Pedro for the regular program, as did the SSC Group Home. (Pl.Ex. 29, A-7, 19). Pedro then spent an overnight at the Atlantic Diagnostic Center. (Pl.Ex. 29, A-8). From April 29 until May 4, Pedro spent overnights at Baychester. On May 5, Pedro *1168 was rejected by eight foster care agencies because there were no vacancies, and by three others for no reason. (Pl.Ex. 29, A-8, 11, 12).
On May 6, 1986, Pedro was accepted for an overnight at Baychester. (Pl.Ex. 29, A-10). The next day, Pedro was "placed" at Atlantic but he refused to go. He was sent to ECS, whose workers were able to "place" him overnight at McDougal. He had another overnight at McDougal on May 9, after receiving three rejections from other agencies because they had no vacancies. Pedro remained at McDougal for the weekend. (Pl.Ex. 29, A-9, 10, 14, 15). On May 12, as a result of intervention by the Legal Aid Society social worker, McDougal agreed to take Pedro until his next scheduled court date. (Pl.Ex. 29, A-15).
During his time on overnights, Pedro spent days, and sometimes evenings, at the SSC field office. On one night, Pedro did not reach his overnight assignment until 1:00 a.m. He spent his days primarily in a large room described as the "pen" with the other youngsters awaiting "placement." No structured activities, counseling or educational services were provided. (Affidavit of Janet Jassy dated May 19, 1987 ("Jassy Aff."), p. 3). Pedro had no clothing or resources of his own. Since Pedro was not a resident of any one particular foster care agency, he was not entitled to any assistance such an agency might have been able to provide. For example, on May 9, 1986, Pedro complained of a toothache. Upon notifying SSC of his possible need for emergency dental care, Pedro's social worker was told there was no guarantee that he would receive any treatment. SSC claimed to have no funds at hand for such an emergency. (Jassy Aff., p. 3).
The court has no record of Pedro's placement after May 12, 1986. (Johnson Aff., p. 5).

Voluntarily Placed Children:

Derrick
Derrick Zoe is sixteen years old and Hispanic. He has been the subject of SSC investigation since April 1983. At that time, he was voluntarily placed at St. Agatha's Home by his mother, who claimed he was performing inadequately at school and was inattentive to parental command. (Pl.Ex. 53, F-30, 32). Derrick, however, was characterized as a "positive influence" on the other children in the home and a "prime candidate" for a small group home. (Pl.Ex. 53, F-63). A psychological report issued the next month stated that Derrick was "the product of a broken home," was in need of psychological testing to reveal the extent of his problem, and needed a stable adult figure with whom he could identify. (Pl.Ex. 53, F-69, 70).
During the next year and a half, Derrick's relationship with his mother steadily declined. Attempts to discharge him in November 1984 were unsuccessful. Derrick was voluntarily placed at a group home in New York City. (Pl.Ex. 53, F-137-140). After he went AWOL in January 1984, another psychiatric report indicated that Derrick's problems were becoming more serious. (Pl.Ex. 53, F-144). Derrick spent most of 1985 in group homes, and was increasingly hostile to those in charge of the homes in which he was staying. (Pl.Ex. 53, F-145-50).
In February 1985, Derrick was placed at St. Agatha's. He grew increasingly unhappy with his situation and expressed a desire to be placed in a community-based program. (Pl.Ex. 53, F-177). On April 17, Derrick assaulted a caseworker at St. Agatha's. A petition was filed the next day with the Rockland County Family Court (Pl.Ex. 52, p. 1) and Derrick was subsequently remanded to SSC as a juvenile delinquent. (Pl.Ex. 53, F-192).
Derrick's exposure to the overnight program lasted only ten days, but he was still "placed" five separate times at three different facilities. (Jassy Aff., p. 2). Furthermore, he was referred to at least nine other facilities which turned him down, primarily because he exhibited behavioral problems. (Pl.Ex. 52, A-4). On April 25, on his way from the Bronx field office to MIV, where he had slept the previous night, Derrick ran away from the transportation officer. He returned three days later *1169 and was sent to Atlantic Diagnostic, which released him into home care on May 3, after a court date. (Jassy Aff., p. 2).
Derrick has described the agency home to which he was sent as unclean, dangerous and inadequately staffed. He received no formal educational services. Nor did he participate in any structured activity while in the overnight program. (Jassy Aff., pp. 2-3). We have no report on Derrick since his return home on May 3, 1986.

DISCUSSION

NATURE AND SCOPE OF THE ACTION
Plaintiffs motions to supplement the complaint, compel discovery, expand the class definition and for a second preliminary injunction to close East Harlem (collectively, the "Supplemental Motions") are based on an overbroad view of the nature and scope of this action.
Plaintiffs have contended that this case has always challenged the City's alleged failure to provide "proper stable placements in which appropriate conditions prevailed and adequate care was provided." (Plaintiffs' Reply Memorandum Concerning Their Motion to Supplement the Complaint, ("Pl.Rep.Br. on Motion to Supplement"), p. 5). Accordingly, plaintiffs propose that they be permitted to add a claim for relief from the City's alleged unconstitutional practice of placing children in unlicensed, overcrowded facilities which are inappropriate for their ages and in which adolescents and young children are housed together. Also as a result of their conception of the instant action, plaintiffs seek discovery relating to the alleged overcrowding of congregate care facilities and the impact of congregate care on children under ten years old, regardless of exposure to the overnight program. Most significantly, plaintiffs wish to expand the current class to include "all children who are or will be in foster care with the New York City Commissioner of Social Services and who are not placed appropriately immediately upon the entry into foster care because of the lack of an adequate number of appropriate foster care settings." (Pl.Br. on Second Motion, p. 23).
Plaintiffs' position is largely incompatible with their amended complaint, the thrust of this court's July Hearing and the narrowly tailored class certified as a result of the Interim Settlement Agreement. The central issue in this case, reflected in the court's proceedings and plaintiffs' original submissions, is whether the City's practice of repeatedly assigning children to foster care facilities on an overnight basis is constitutional.
Questions about the constitutionality of any other of the City's alleged placement practices raise entirely new factual and legal issues. Resolution of those issues are more properly the subject of additional lawsuits.[32] The new factual issues are apparent. For example, plaintiffs have now asked this court to inquire into the conditions at particular unlicensed, overcrowded facilities and the appropriateness of those facilities for certain children, without regard to whether the children exposed to those facilities and conditions are on overnights. As will be more fully discussed in the next section of this Opinion, this case does not present a question of whether or not overnights are "appropriate" placements, but whether they constitute placements at all. The different factual and legal questions raised by plaintiffs' motions remain, even if the conditions are allegedly caused by the same set of circumstances  the shortage of foster care beds.
Plaintiffs themselves appear to have retreated from the relief sought in their Supplemental Motions. Plaintiffs most recently argued that:
if the Court finds defendants liable for their practice of repeatedly placing foster children on an overnight basis, it can reach the [Additional Practices] at a remedy hearing. Otherwise, plaintiffs would *1170 be deprived of a meaningful remedy ... The Court bifurcated the liability and remedy aspects of plaintiffs' claims. Therefore, after a finding of liability, the Court would not, however, have to make a finding that these practices themselves are a constitutional violation in order to give plaintiffs relief from them.
(Plaintiffs' Reply to Defendants' Statement of Outstanding Issues ("Pl.Rep. on Outstanding Issues"), p. 2). While plaintiffs now state that the court need not determine the constitutionality of the Additional Practices, such a determination lies at the heart of the Supplemental Motions.
While we do not agree that the Supplemental Motions are addressed solely to the remedial phase of this litigation, we do agree with plaintiffs that some of the discovery which they seek would be relevant to a mandatory injunctive remedy.[33] Should this court decide to issue a mandatory injunction, information regarding the types of placements that should be made available to class members, as well as the City's plans to develop such placements will be relevant.
In view of the above discussion, plaintiffs will be permitted to supplement their complaint only insofar as they make allegations concerning unconstitutional conditions imposed upon class members at the facilities to which they are sent on an overnight basis. Plaintiffs may further supplement their prayer for mandatory relief to request an order remedying those conditions. Plaintiffs' motion to supplement the complaint is in all other respects denied.
Plaintiffs' motion to compel discovery is also granted insofar as their requests and questions relate to conditions which characterize the overnight program or its remedy. The motion to compel is otherwise denied.
Plaintiffs' motion to expand the class definition is denied. Plaintiffs' motion for a second preliminary injunction to close East Harlem is denied as outside the scope of this action.

ENTITLEMENT TO PRELIMINARY INJUNCTIVE RELIEF
To obtain a preliminary injunction, plaintiffs must show that they are:
likely to suffer irreparable injury if [such] relief is denied [and] there is either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the [applicant's] favor.
In re Feit Drexler, Inc., 760 F.2d 406, 415 (2d Cir.1985) (bracketed material in original) (quoting Proctor & Gamble Co. v. Chesebrough-Pond's Inc., 747 F.2d 114, 118 (2d Cir.1984)).
Where mandatory injunctive relief is sought, a higher standard must be met. There must be a "clear showing that the moving party is entitled to the relief requested." Flintkote Co. v. Blumenthal, 469 F.Supp. 115, 125-26 (N.D.N.Y.), aff'd, 596 F.2d 51 (2d Cir.1979), or that "extreme or very serious damage will result," if relief is denied, Clune v. Publishers' Association, 214 F.Supp. 520, 531 (S.D.N.Y.), aff'd, 314 F.2d 343 (2d Cir.1963). In Jacobson & Co., Inc. v. Armstrong Cork Co., 548 F.2d 438, 441-42 n. 3 (2d Cir.1977), the court held that "irreparable harm" is indistinguishable from "extreme or very serious damage." And in Abdul Wali v. Coughlin, 754 F.2d 1015, 1026 (2d Cir.1985), the Second Circuit held plaintiffs to a showing of "substantial likelihood of success on the merits," somewhere in between the ordinary and stricter standards necessary for prohibitory and mandatory relief.
Generally, an injunction is mandatory if it alters the status quo. Abdul Wali, 754 F.2d at 1025. That, however, is not the *1171 sole criteria for distinguishing between mandatory and prohibitory relief. If a non-moving party is ordered to perform an act, rather than restrained from performing, the relief sought is mandatory. Abdul Wali, 754 F.2d at 1025-26.
In the instant case, there is no status quo. There is, rather, a steady state of change. The defendants have acknowledged that maintenance of children in offices and temporary overnight facilities "is not an ideal situation." The City represented more than one year ago that they were "striving to bring it to an end." (Defendants' Brief in Opposition to the First Motion for a Preliminary Injunction ("Def.Br. on First Motion"), p. 10). Since this action was instituted, conditions at the field offices have apparently improved as a result of the Interim Settlement Agreement. The overnight program has, however, continued while the defendants attempt to develop more foster care beds. (See Defendants' Supplemental Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Def.Br. on Renewed Motion"), p. 15; Affidavit of John Courtney dated September 25, 1986 ("September 25, 1986 Courtney Aff."); Exhibits A and B to September 25, 1986 Courtney Aff.; Affidavit of John Courtney dated August 21, 1987 ("August 21, 1987 Courtney Aff."))
Nevertheless, plaintiffs have requested mandatory injunctive relief, essentially asking this court to supervise the establishment of more foster care facilities. The question of whether mandatory or prohibitory relief is appropriate in this case, however, will be the subject of a subsequent hearing.
Considering the fluidity of the situation and the reservation of our determination on the appropriate remedy, we will hold plaintiffs to the higher standard required for mandatory injunctions for the purpose of deciding the question of entitlement.

Likelihood of Success on the Merits
Plaintiffs do not challenge the fact of the Commissioner's custody. They do claim that the treatment which they and other children have received while awaiting placement violates their substantive due process rights. Plaintiffs argue that by (1) repeatedly moving children from office to bed and back again over extended periods of time without assigning them a stable foster care placement; and (2) failing to ensure adequate clothing and a daily opportunity to bathe, the Commissioner has deprived them of liberty without due process of law.
In addition to their federal constitutional claims, plaintiffs argue that the Commissioner's treatment violates Article XVII, Section 1 of the New York State Constitution.[34] Plaintiffs further ground their action in various provisions of the New York Social Services Law and state regulations governing the operation of public child care institutions.
The defendants have taken the position that the state law claims are barred on three grounds: (1) the Eleventh Amendment strips this court of its discretion to exercise pendant jurisdiction over them under the Supreme Court's decision in Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); (2) plaintiffs fail to state a claim upon which relief can be granted under state law; and (3) abstention is appropriate under Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943).
The court does not find defendants' arguments with respect to plaintiffs' state law claims persuasive on the record as it now stands.[35] However, for purposes of determining *1172 plaintiffs' entitlement to preliminary injunctive relief, we will consider only the federal constitutional claims over which the court's jurisdiction is unchallenged.
Our first task is to determine whether plaintiffs have a constitutionally protected liberty interest in certain minimally adequate conditions and treatment by virtue of the Commissioner's exercise of custody over them. Board of Regents v. Roth, 408 U.S. 564, 571, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972).
Relying upon Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), Parham v. J.R., 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and Society For Goodwill to Retarded Children v. Cuomo, 737 F.2d 1239 (2d Cir.1984), plaintiffs argue that once their custody was transferred to the defendants, they owed these children decent, habitable living conditions, as well as rational decisions about where and how they would live.
Youngberg involved the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment. Parham involved the constitutionality of a state's procedure for voluntary commitment of children to state mental hospitals. Taken together, these cases establish the entitlement of those groups to minimally adequate food, clothing, shelter, medical care, safety, freedom from bodily restraint and reasonable training to ensure the latter two rights.
In Society For Goodwill to Retarded Children, the Second Circuit went beyond Youngberg and held that residents of state schools for the mentally retarded have a due process right to "training sufficient to prevent basic self-care skills from deteriorating." Society for Goodwill, 737 F.2d at 1250.
Bell established the test for determining whether conditions of criminal pretrial detention implicate constitutional liberty interests. The Bell Court held that "the proper inquiry is whether those conditions amount to punishment of the detainee." Bell, 441 U.S. at 535, 99 S.Ct. at 1872.
Plaintiffs argue that the conditions to which foster care children are subjected while in the state's custody and control should be subject to, at the very least, the scrutiny given the living conditions of pretrial detainees and mental health committees, and to stricter standards than those applicable to convicted prisoners.[36] Echoing the Supreme Court's analysis in Youngberg, plaintiffs reason that foster care children, like individuals committed to state mental institutions, are not subject to punishment[37] and are therefore entitled to have their liberty interests protected at least as well as prisoners. See Youngberg, 457 U.S. at 315-16, 102 S.Ct. at 2458.
The defendants apparently concede plaintiffs' analogy and acknowledge the rights of these foster children in adequate shelter, *1173 food, clothing and medical care. Defendants also acknowledge a right to minimally adequate training to ensure safety and freedom from undue restraints for those who are "developmentally impaired." (Def.Br. on First Motion, pp. 3-4). The law in this circuit supports that view. Wilder v. City of New York, 568 F.Supp. 1132, 1137 (E.D.N.Y.1983) (as a ward of the City, foster child has a liberty interest in minimally adequate care and treatment); Brooks v. Richardson, 478 F.Supp. 793, 795 (S.D.N.Y.1979) (a child who is in the custody of the state and placed in foster care has a constitutional right to at least humane custodial care). Defendants go on to argue, however, that adequate provisions for these basic liberty interests have been made by DSS and SSC officials. The adequacy of the City's care for these children will be discussed in the next section.
Defendants attempt to distinguish between plaintiffs' interest in certain minimally adequate conditions during placement (or while awaiting placement) and the right to an immediate, stable foster care placement, which they believe is at the center of plaintiffs' case. Defendants do not, as the court understands their argument, concede that plaintiffs have a liberty interest in obtaining a stable placement.
Defendants rely primarily on Child v. Beame, 412 F.Supp. 593 (S.D.N.Y.1976) and Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The claimed liberty interest in Child differs from the interest asserted by plaintiffs here. Plaintiffs in this case do not challenge the Commissioner's right to continued custody, but rather the conditions of that custody. In the instant case, plaintiffs' asserted liberty interest derives not from SSC's act in taking children away from their families but in hindering their development while in the City's custody.[38] Plaintiffs here do not assert a right to an immediate permanent placement, let alone a permanent adoptive home. They assert a right to humane living conditions while awaiting permanent placement. They object to being shuttled nightly to different places to sleep, carrying their few possessions with them while they spend days in offices waiting for placement. In Child the "plaintiffs [did] not question the living conditions in their foster homes. Rather, they [contended] ... that the `continued confinement,' even in comfortable foster homes" is unconstitutional. Child, 412 F.Supp. at 608.
The defendants' analogy to Bell is somewhat useful, but must be understood in terms of the different purposes behind criminal pretrial detention and foster care. The defendants contend that under Bell a constitutional violation cannot be found unless overnights constitute punishment.[39] In Child Judge Weinfeld of this court wrote:
The attempt to equate the child plaintiffs' status while in the foster care of the state with those who are taken into custody under a civil commitment because of mental illness, physical retardation, incorrigibility or similar causes, is somewhat far-fetched. The civilly committed have been deprived of their liberty by the state while the state's action in *1174 taking the child plaintiffs into foster care, whether with an institution or foster parent, is not a deprivation of liberty. The state has merely provided a home for them in substitution for the one the parents failed to provide. To keep them under substitute guardianship is not a denial of treatment.

Child, 412 F.Supp. at 608 (emphasis added). Even more far-fetched is an attempt to equate the child plaintiffs' status with that of prisoners. As to this plaintiff class, the defendants have assumed the role of parens patriaenot jailors.
While it is this court's belief, after listening to the testimony and considering the submissions, that the night-to-night program and the conditions which are an inherent part of it, have caused plaintiffs and numerous other children "to endure genuine privations and hardship over an extended period of time," we do not believe that or the other test set forth in Bell[40] is the appropriate test in the foster care context.
Bell is not inconsistent with the constitutional requirement that "the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972) (procedural due process case). Bell simply states a test consistent with the purpose of pretrial detention.
The purpose of the foster care system is not the purpose of pretrial criminal detention. In Bell, the Court made clear that "the `essential objective of pretrial confinement is to insure the detainee's presence at trial.'" Bell, 441 U.S. at 539, 99 S.Ct. at 1874 (citation omitted). The Court held that the government's interest in assuring the detainee's presence at trial as well as its legitimate need to manage the facility in which an individual is detained, may justify the imposition of restraints and conditions.
The goal of the foster care system is to further the best interest of children by helping to create nurturing family environments without infringing on parental rights. Sections 384-b(1)(a)(iii) and (iv) and section 384-b(1)(b) of the N.Y.Soc.Serv.Law state:
(iii) the state's first obligation is to help the family with services to prevent its break-up or to reunite it if the child has already left home; and
(iv) when it is clear that the natural parent cannot or will not provide a normal family home for the child and when continued foster care is not an appropriate plan for the child, then a permanent alternative home should be sought for the child.
(b) The legislature further finds that many children who have been placed in foster care experience unnecessarily protracted stays in such care without being adopted or returned to their parents or other custodians. Such unnecessary stays may deprive these children of positive, nurturing family relationships and have deleterious effects on their development into responsible, productive citizens. The legislature further finds that provision of a timely procedure for the termination, in appropriate cases, of the rights of the natural parents could reduce such unnecessary stays.
It is the intent of the legislature in enacting this section to provide procedures not only assuring that the rights of the natural parent are protected, but also, where positive, nurturing parent-child relationships no longer exist, furthering the best interests, needs, and rights of the child by terminating the parental rights and freeing the child for adoption.
The legislature and the professional literature indicate that permanence, either through the return of the child to the natural family or adoption, is the means by which the foster care system is designed to meet its goal. See Marshal Garrison, Why Terminate Parental Rights?, 35 Stan.L. Rev. 442-446 (Feb. 1983); J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child (2d ed. 1981), 97-101; Mnookin, Foster Care-In Whose Best Interest?, *1175 43 Harv.Educ.Rev. 599, 628-35 (1973).[41]
Elizabeth Mayberry, SSC's administrative director of the Office of Field Services and the Office of Placement and Accountability, testified that the goals of SSC are to take children who have difficult behavioral problems, and "provide a constructive place for them to live, go to school and carry on as normal activities as they can, plus receive remedial care for their problems." (Tr., p. 361).
The children in the night-to-night program, unlike those in Child, do not ask the Commissioner to reach the stated goal of permanency which the foster care system sets for itself. They do argue that the treatment they receive while in his care must bear some reasonable relation to that goal and his legitimate interest in managing the foster care system. We agree.
The Commissioner's practice of placing traumatized children in the night-to-night program is inconsistent with the stated purposes of the foster care system in general and the goals for PINS, abused and neglected children, juvenile delinquents and voluntarily placed children specifically. The overnight system's inherent instability as well as its inevitable lack of any coordinated supervision of basic needs or support has resulted in physical, emotional and psychological harm to the children exposed to it. Children are by their nature in a developmental phase of their lives. If they do not move forward, they move backward. Positive efforts are necessary to prevent stagnation, which, for children, is synonymous with deterioration. The evidence indicates an even more egregious situation. The problems of children who participate in repeated overnights are exacerbated by the experience. Children adjudicated PINS for truancy have, in the past, not been sent to school. Children who are found to be in need of supervision are unsupervised and go AWOL.
The instability which characterizes the night-to-night program is completely contrary to the foster care system's general goal of permanency. John Stevens, an SSC employee who supervises a unit which finds placements for children who are voluntarily placed with the Commissioner,[42] testified about the children his unit placed on an overnight basis beginning in May 1986.[43]
From May 7 to July 9, 1986, Richard S. was sent on overnights 15 times. From May 7 until June 30, Johnny H. was assigned 25 times. From May 13 to June 23, Sharmaka B. received 20 overnights. From May 15 to July 10, Kasonga K. was assigned 16 times. Faith C. was sent on overnights 17 times between May 27 and July 8. Carmen G. experienced 14 overnights between May 7 and July 3. Charles D. was on overnights 11 times between May 7 and May 29. Between May 14 and July 7, John A. was assigned 17 times. Adriane G. was assigned to overnights 11 times from May 16 through July 7. Nigel R. was sent on overnights 12 times between May 27 and June 16. Between May 29 and June 30, Louis D. experienced 18 overnights. The list goes on. (Tr., pp. 203-06).
Stevens' unit merely handles voluntary placements for "the Bronx and for the letter of the alphabet in Queens from L to Z." (Tr., p. 197). SSC records indicate that the experience of repeated overnight "placements" is not unusual and has not abated over the last year. (See Background section of this Opinion, pp. 19-22).
*1176 The uniform opinion of each of the three doctors who testified in this case was that the multiple overnight experience of these children has a short and long-term negative effect on their abilities to trust and form stable relationships either in later foster care placement with family members or with other members of society.[44] Dr. Levitt testified that the repetition of overnight "placements" increases the child's sense of insecurity and worthlessness. (Tr., p. 130). He stated that overnighters lose contact with their families and experience daily rejection because they don't stay on in the foster care facilities as other kids do. (Tr., p. 141).
Dr. William H. Kaplan testified that the professional literature indicates that "there is a pretty near consensus that children who suffer multiple temporary placements, many changes, are exposed to increased risk in later life." (Tr., p. 388). By "increased risk," Dr. Kaplan meant increased likelihood of "extremely maladapted behavior." (Tr., p. 390). Dr. Kaplan further testified that with the disturbed children typical of those on overnights, "it is quite probable that it decreased the likelihood that they could tolerate a stable placement." (Tr., p. 460).
Dr. Sandra Shepherd reported that "children are being made more vulnerable than they have previously been." (Tr., p. 679). Dr. Shepherd, reading from a study agreed that:
Multiple placements have disastrous effects on the abilities to learn, trust, and relate to others. Such children already made vulnerable by the circumstances are placed at further risk by the vagaries of foster care. Serious retardation in reading, antisocial behavior, apathetic states and defects in socialization have all been compellingly described as a sequel to this experience.
(Tr., p. 680). Dr. Shepherd reiterated the view that the overnight program is "disastrous ... it is going to exacerbate all of the problems with which those children come into the system." (Tr., p. 689).
Just as the overnight program is inconsistent with the general purpose of foster care, the program bears no reasonable relationship to the specific statutory purposes for which the Commissioner assumes custody of PINS, abused and neglected children, juvenile delinquents and voluntarily placed children.
The purpose of the PINS procedure is to determine whether the child "requires supervision or treatment."[45] N.Y.Fam. Ct.Act § 712(f) (McKinney's 1983). In Sinhogar v. Parry, 74 A.D.2d 204, 427 N.Y. S.2d 216, 222 (1st Dept.1980), the court explained:
In authorizing the Family Court to order `treatment' of delinquents and PINS children, and investing it with a broad range of authority to give children within its jurisdiction `such care, protection and assistance as will best enhance their welfare' *1177 (Family Court Act § 255), the legislature intended to provide a right to treatment related to the anti-social behavior for which the child is being deprived of his liberty.
Several courts have recognized a due process right to a "bona fide effort to adequately treat" and not merely provide custodial care for PINS. Matter of Lavett M., 35 N.Y.2d 136, 142, 359 N.Y.S.2d 20, 24, 316 N.E.2d 314, 317 (1974); see also Rouse v. Cameron, 373 F.2d 451 (D.C.Cir.1966); Wyatt v. Stickney, 325 F.Supp. 781, 785 (M.D.Ala.1971); Pena v. New York State Division for Youth, 419 F.Supp. 203, 206 (S.D.N.Y.1976); Martarella v. Kelley, 349 F.Supp. 575 (S.D.N.Y.1972).
The record in this case reflects that the Commissioner has failed to ensure that PINS placed on repeated overnights and held in offices are supervised or treated for their alleged antisocial behavior. To the contrary, the evidence suggests that the behavior of such children is allowed to degenerate.
The purpose of child abuse and neglect proceedings is "to help protect children from injury or mistreatment and to help safeguard their physical, mental, and emotional well-being." N.Y.Fam.Ct.Act § 1011 (McKinney's 1983). The Commissioner must "receive and care" for any child alleged or adjudicated to be neglected or abused and placed in his care by the Family Court. N.Y.Soc.Serv.Law § 398(2)(b) (McKinney's 1983). It seems self-evident that the Department of Social Services would not be acting in accordance with its statutory purpose if it caused to be abused or neglected the very children it removed from home because they were victimized by their parents. Brooks v. Richardson, 478 F.Supp. 793, 795-96 (S.D.N.Y.1979). Yet, the testimony in this case revealed that the overnight program may constitute that type of situation. Ms. Beverly Deallie ("Deallie"), an SSC protective services caseworker, testified that in her professional judgment, allegations against parents, acting as the defendants have, in moving a child "from place to place to sleep on a regular basis, that is ... [having the child sleep in] ... lots of different places," would be "indicated" and such parents would face a court action aimed at removing the child from them. (Tr., p. 104).
We conclude that the treatment received by abused and neglected children, forced to endure the overnight program, has not been designed to achieve the protective purpose of the Commissioner's custody.
The purpose of a juvenile delinquency proceeding is to determine whether the child "requires supervision, treatment or confinement," N.Y.Fam.Ct.Act § 352.1(1) (McKinney's 1983), and to issue a dispositional order in accordance with "the needs and best interest of the [child] as well as the need for protection of the community." N.Y.Fam.Ct.Act § 352.2(2) (McKinney's).[46] The goal of the Family Court is rehabilitation of the child. Matter of Williams, 120 Misc.2d 257, 465 N.Y.S.2d 949, 952 (N.Y. Fam.Ct.1983). In that connection, the Court is obliged to obtain the "assurance that society is adequately protected and that there is a bona fide treatment program" for the child. Matter of Norman R., 109 Misc.2d 5, 439 N.Y.S.2d 591 (Fam. Ct.Kings Co.1981).
It should also be noted that even if the Family Court finds that a juvenile delinquent has "mental illness, mental retardation or developmental disability," the court may place the child with the Commissioner for "care and treatment." N.Y.Fam.Ct.Act § 353.4(1) (McKinney's 1983). Moreover, it has been held that juvenile delinquents, in general, have a constitutional due process right under the Fourteenth Amendment to rehabilitative treatment. Pena v. New York State Division for Youth, 419 *1178 F.Supp. 203, 206-07 (S.D.N.Y.1976); enforced (S.D.N.Y.1982).[47]
Juvenile delinquents subjected to systematic and repeated overnights are not the beneficiaries of any official attempt to comply with the expressed goals of the Family Court in remanding them to the Commissioner's custody. Like PINS and abused and neglected children subjected to the overnight program, their lives deteriorate.
The essence of the voluntary placement of a child is the social service agency's obligation to provide "preventive services" to children and their families for the purpose of facilitating the eventual return of the child to the natural parent. "Preventive services" is defined to mean "supportive and rehabilitative services provided ... for the purpose of ... enabling a child who has been placed in foster care to return to his family at an earlier time than would otherwise be possible; or reducing the likelihood that a child who has been discharged from foster care would return to such care." N.Y.Soc.Serv.Law § 409 (McKinney's 1983). The state assumes custody in order to strengthen the parent-child relationship so that foster care will no longer be necessary.[48]
The purpose of a voluntary placement is also defined by the terms of the written instrument executed by the child's parent or guardian which transfers custody to the Commissioner. N.Y.Soc.Serv.Law § 384-a (McKinney's 1986 Supp.). It appears that although the terms of such agreements are open to negotiation (N.Y.Soc.Serv.Law § 384-a(2)(a) (McKinney's 1986 Supp.)), agencies generally require the execution of standardized forms. See Smith v. Organization of Foster Families for Equality and Reform, 431 U.S. 816, 825, 97 S.Ct. 2094, 2100, 53 L.Ed.2d 14 (1977).
The night-to-night program subjects voluntarily placed children to situations which are inconsistent with the purposes of their placement. The testimony reveals that the defendants have not taken steps to provide the type of support which would be reasonably related to helping these children to form trusting relationships with their parents. Rather, they have created an environment which lessens the likelihood that they will be capable of returning home without again resorting to foster care.
Where the issue of a constitutionally protected liberty interest in certain conditions and treatment is raised, the test for determining the adequacy of those conditions hinges upon two factors: (1) the exercise of professional judgment; and (2) whether they are isolated examples or a common occurrence. The Second Circuit explained the first factor as follows:
The controlling standard for determining whether those rights have been violated is given in Youngberg. There, the Supreme Court held that whether the state has provided the necessary safe conditions and freedom from undue restraint is determined by ascertaining whether "`professional judgment in fact was exercised.'" 457 U.S. at 321, 102 S.Ct. at 2461 (quotation omitted). The constitutional norm is violated "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards *1179 as to demonstrate that the person responsible actually did not base the decision on such a judgment." Id. at 323, 102 S.Ct. at 2462. (footnote omitted).[49]
Society for Good Will, 737 F.2d at 1246.[50] In the same opinion, the Second Circuit supplied the second portion of the test: "Isolated instances of inadequate care ... do not demonstrate a constitutional violation." Id., at 1245.
In view of these criteria, we discuss whether children exposed to repeated overnights have been provided with constitutionally adequate shelter, treatment, bathing facilities and clothing.[51]
The overnight program constitutes an inherent deprivation of adequate shelter and treatment for children waiting to be placed by the Commissioner.[52]
We analyze the adequacy of shelter in terms of its two components: (1) the nature of the facilities in which overnighters are housed; and (2) the duration of the children's use or access to those facilities.
Children on overnights stay in SSC field offices during the day. If there is a place for them, they go to direct care or agency-operated foster care facilities at night to sleep. When SSC has been unable to provide even an overnight assignment for a child by approximately 10:00 p.m., those children have been and continue to be sent to the Emergency Children's Services Office at 240 Church Street in Manhattan to sleep. (Tr., p. 225, 244; see Background section of this Opinion, pp. 19-20).
There are six SSC field offices where children in the overnight program spend their days waiting for their next overnight or a regular placement: two in Brooklyn, located at 345 Adams Street ("Adams") and 1254 Bedford Avenue ("Bedford"), and one in each of the other boroughs.
According to the record, field offices have always been used by children to await placements or interviews with caseworkers. Accordingly, some space has always been provided for them at the field offices. With the explosion of repeat overnighters beginning in 1985, demands on these offices have changed and increased.
Significant evidence by way of testimony and affidavits has been provided with respect to the conditions prior to the Interim Settlement Agreement in field offices in Brooklyn, Manhattan and the Bronx as well *1180 as the ECS office in Manhattan. Limited information has been provided concerning the Queens and Staten Island field offices.[53] Each office is equipped with what defendants call "nurseries" and "adolescent lounges." More specific descriptions of those spaces as of the filing of this lawsuit are given below.
The Bedford Avenue field office is located in a transitional area in the Bedford Stuyvesant section of Brooklyn. (Affidavit of Nanette Schrandt, ("Schrandt Aff."), ¶ 9). The adolescent waiting area was moved three times to different locations within the office during July 1986. (Tr., p. 87). After the second week in July 1986, children aged 11 to 17 were kept on the sixth floor of the building in a room approximately 9 by 12 feet, with windows. (Tr., p. 88). The room had a couch and a television set for the five or six children that usually stayed there.[54] No provisions for bathing or showering was made for adolescents. (Tr., p. 102).
Before the teenagers were kept in the room on the sixth floor, they were held briefly in the building's basement. The basement has a concrete floor, no windows and a fan without any other system of ventilation.[55] (Tr., p. 90) While the adolescents were confined to the basement, the temperature reached 92 degrees in the office above them. (Tr., p. 92). The room was furnished with desk-top chairs, a desk, tables, blackboards and a cot in the back for "children [who] don't feel well." (Tr., pp. 90-91, 116-117). The basement also contained asbestos. (Tr., pp. 315-317).
Prior to being maintained in the basement, and for at least a year and a half, adolescents were held in an "exceptionally small space" on the first floor. (Tr., pp. 313-314, 380). Dr. Kaplan, who visited the Bedford field office on June 17, 1986 observed:
There was a TV set which was not operating very well and there was a table and some chairs in there. And a number of the kids were eating at that time. It seemed to me that it was quite unclean and again extremely impoverished in terms of a lack of any kind of visual stimulation.
(Tr., p. 380).[56]
Unlike the adolescent waiting room, the nursery in Brooklyn was in the same place on the first floor for "as long as [Mayberry who had been working in the foster care system for 23 years had] known." (Tr., p. 318). Children up to 12 years old were kept in a single room with two cribs, two desks and a chair. (Tr., p. 94). Sometimes, more than five children were squeezed into the nursery. When it was overcrowded in the nursery, caseworkers kept children in playpens. (Tr., p. 95).
In May 1986, however, the nursery was moved to the sixth floor to a "bigger and wider" room. The new room contained "larger cribs ... little cots for the kids who were to sleep in cots, [and] a little larger cot." (Tr., pp. 96-97). If younger children returned dirty from overnights, caseworkers personally bathed them in the ladies' bathroom. (Tr., p. 102). The bathroom contained no bathtub, only sinks and toilets. (Tr., p. 103).
*1181 The Manhattan field office is located at 80 Lafayette Street, a business area near the courts. (Schrandt Aff., ¶ 9). To get to the adolescent waiting room, children must walk through the office's main reception area, where parents and children wait to speak with caseworkers. Referred to as the "pen" by the adolescents, the reception area was noisy and apparently somewhat chaotic. (Tr., p. 299). On the left side of the reception area there were partitions creating two small "very impoverished" rooms (about 8 by 10 feet) which housed the adolescents from 9:00 a.m. until 10:00 p.m. (Tr., pp. 244, 300, 383). One room contained a television set on top of a file cabinet. The other room contained a desk and two molded plastic chairs. The room was crowded if more than three children were in it at one time. (Tr., p. 301). Prior to May or June 1986, adolescents did not go outside the office on a regular basis in any planned activity except to go AWOL. (Tr., pp. 301-302).
The nursery at the Manhattan field office was set up for children up to ten years old.[57] After May 1986, it was located on the sixteenth floor. (Tr., p. 297). There were three cots, four cribs, four desks and a full-sized refrigerator in a converted conference room that was approximately 14 by 20 feet. (Tr., pp. 236, 297). Children were washed in a nearby bathroom in sinks. A plastic tub was used for infants. (Tr., p. 236). The nursery was used by an average of five to six children a day, most of whom had been removed from their homes because they were in "imminent danger." (Tr., p. 238).
The Bronx SSC field office is found at East 151st Street and the Grand Concourse. There is a narrow paved parking area and a general reception area through which the children must pass to get to the adolescent waiting room. Children over approximately age 9 sat in an 11 by 14 enclosure, partially petitioned off from the main waiting room. (May 19, 1986 Firestein Aff, ¶¶ 4, 5; Schrandt Aff., ¶ 8).
The adolescent area was described by Dr. Shepherd, who visited it about a week before the July Hearing, as follows:
Basically there was a small sort of separate office cubicle. There were probably about 10 or 12 plastic chairs just around the edges of that, that little area. There was a small table or stand in the corner. I didn't see any other furniture besides those chairs and that little table.
(Tr., p. 687). On his visit on June 17, 1986, Dr. Kaplan "observed no structured activity and the room itself was extremely small. Visually, very understimulating. It was a very impoverished-looking room." (Tr., p. 380).
The Bronx nursery was set up on the opposite side of the general reception area, separated only by a waist-high divider. The room contained cribs, a changing table, infant supplies and toys. (Schrandt Aff., ¶ 8). According to Dr. Shepherd, "[i]t [was] quite a confined space." (Tr., p. 684). While she was there, she saw "probably a dozen children, several of them were in cribs. In one crib there seemed to be two children ..." (Tr., p. 683). The public restroom, used by the adolescents and anyone waiting in the reception area, was used to care for the children. "There were six toilets, one out of order, and five sinks." (Tr., p. 685). Dr. Shepherd saw no special toileting facilities for children. (Tr., p. 686).
The record contains little or no description of the Adams Street field office in Brooklyn, or of the offices in Queens and Staten Island. We believe, however, that the conditions described above were typical of the situations in those other offices. (Tr., pp. 235-262).
ECS is situated in the same building that houses Emergency Family and Adult Services, where homeless families are taken. ECS was arranged as a large central area with desks and desk cubicles which afforded little flexibility for rearrangement. (Schrandt Aff., ¶ 10). The record indicates that until approximately mid-June, all children who stayed at ECS stayed in one small room, approximately 9 by 15 feet, *1182 containing a couch, file cabinets, several cots and cribs and possibly a television set. (Schrandt Aff., ¶ 7). Adolescent boys and girls slept in the same room. (Tr., pp. 303-304).
While the conditions at the field offices have undoubtedly improved over the last year, plaintiffs' supplementary allegations suggest that overnight accommodations for children who have not yet been placed have worsened. No matter how improved, the field offices remain social services offices. As such they were not designed to provide daily shelter for children.
At the time of the July Hearing, some doubt had already been cast regarding the nighttime treatment received by overnighters in authorized foster care facilities. Deallie testified as follows:
At times some of [the children returning from overnights] appear to be dirty looking. When I say that let me explain. Their clothes are soiled with whether it's dirt or grease, whatever on their pants if it's a boy. The shirt is ruffled, the hair is sometimes not combed. If it's a girl, a young lady, she will come back in with the same clothes that she leaves. I personally would ask them, especially if they are my caseload, what has happened, where did you sleep and that is the first question I would ask them ... some of the kids say that they stay up all night because there are nights in that particular setting where they are afraid that their clothes are stolen from them. There [are] times that they are forced to sleep on the floor, whatever, because they are afraid of interaction or altercation with other kids and things like that.
(Tr., pp. 101-102). In addition, Derrick Zoe told his Legal Aid Society social worker that the agencies he was sent to were "unclean, with people spitting on the floors and that there was a serious lack of towels and clean linen." (Jassy Aff., ¶ 7).
Since the July Hearing, overnighters have apparently been consigned to sleeping in unlicensed emergency shelters. Plaintiffs contend that they have additionally been subjected to overcrowded conditions at authorized facilities. Since plaintiffs have now been granted limited discovery on these issues, we do not at this time base our conclusions on the existence of such conditions.
By its nature, the overnight program limits childrens' access to the facilities, whatever their condition, in which they are kept. Regardless of the physical adequacy of those facilities, the childrens' restricted temporal exposure necessitates a finding of inadequacy.
Children who are fortunate enough to obtain immediate stable placements remain at the same authorized foster care facility during the day and at night. Those who are forced to endure the night-to-night program often spend their mornings at one foster care agency, their days at one of the field offices described above, and their evenings at a different foster care facility or at ECS. If an overnight assignment is identified by a caseworker after their arrival at ECS, the child would then be "transported" to yet another facility.
Children are moved from borough to borough in search of a place to sleep. For example, Richard Roe spent his days at the Bronx field office from April 30 until May 12, 1986. He was sent to a number of shelters to sleep, including St. Johns, located in Rockaway Park in Queens. (May 19, 1986 Firestein Aff., ¶ 2). Tanya Poe's trip between the Bronx field office and MIV, where she had frequently stayed overnight, required one and one-half hours each way.
A child on overnights might spend from 8:00 or 9:00 a.m. until 10:00 p.m. in a field office (May 19, 1986 Firestein Aff., ¶ 2; Tr., p. 244). If transportation to and from a shelter takes about two hours, that child might spend a total of 8 or 9 hours per day at a foster care facility. Even if conditions at these overnight shelters are adequate, children in the night-to-night program spend only about one-third of their time in such places. And, during that one-third they are presumably asleep. Greene appropriately termed overnights "rest stops," not placements. (Tr., p. 224).
As a result of being constantly moved from place to place, children are precluded from using the shelter which is provided, *1183 however inadequate, in ways that people normally use their homes. The children in the night-to-night program do not have something as basic as a place to hang clothes or put a toothbrush. Reporting his observations about East Harlem, where class members had been assigned, Dr. Kaplan testified:
I observed something but it really only hit me afterwards of what I observed. There [were] no closets for the children's clothes and no tables on which a favorite doll or a picture [from] home or anything else was present, it was bare bones.... I was struck by the absence of the kind of privacy and the possessions that one normally associates with a room for children.
(Tr., pp. 122-23). Mayberry acknowledged that children who are on overnights, and who have their own belongings, carry them around from place to place in plastic garbage bags. (Tr., p. 324). We can only conclude that children on overnights are not living all that differently from the homeless who spend their nights in city shelters and their days on the streets of New York.[58]
The Commissioner's decision[59] to subject children awaiting placement to the overnight experience is such a substantial departure from accepted professional standards that this court finds that his professional judgment was not exercised. Defendant Brettschneider has virtually admitted that he did not exercise his professional judgment with respect to the night-to-night program.
Minimally acceptable professional standards may be found by considering (1) regulatory guidelines; and (2) the testimony of experts in the relevant field.
The federal constitution does not require the Commissioner to comply with all the terms of state statutes and regulations governing the administration of the foster care system. The standards of care implicit in such regulations, however, are relevant to discerning the minimal standards accepted by professionals in their areas of expertise. See Woe By Woe v. Cuomo, 729 F.2d 96, 106-07 (2d Cir.), cert. denied, 469 U.S. 936, 105 S.Ct. 339, 83 L.Ed.2d 274 (1984) (state accreditation of mental health facility is prima facie proof of adequacy).
The state requires that every child must have a suitably equipped bed and a dresser or other personal storage space. 18 N.Y.C.R.R. § 442.6 (McKinney's 1983). Children over five years old of the opposite sex are not permitted to sleep in the same room. 18 N.Y.C.R.R. § 442.6 (McKinney's 1983). There must be an adequate number of toileting and bathing facilities, including a tub or shower. 18 N.Y.C.R.R. § 442.7 (McKinney's 1983).
Day care regulations require the administration of program activities that enhance childrens' skills and positive self-images and meet their individual needs. 18 N.Y.C. R.R. § 418.16 (McKinney's 1983).
Doctors Kaplan and Shepherd each testified that the shelter and treatment decisions characterizing the night-to-night program diverged from accepted professional standards.
Dr. Kaplan stated that field offices were not appropriate or adequate places for the children whose records he studied. (Tr., pp. 455, 458). Dr. Shepherd testified unequivocally that the Bronx field office was "totally, totally inappropriate for children of all ages."[60] (Tr., p. 689).
All three doctors who had extensively reviewed the individual records of the children *1184 involved in this case stated that minimally acceptable professional standards for treatment were violated by the decision to put these children in a program of repeated overnights. (Tr., pp. 144, 462-468, 693).
The Commissioner's care and treatment of repeat overnighters deviates significantly from the minimum standards implicit in state regulation of day care centers and institutions for children as well as the expert testimony presented in this case.
Defendant Brettschneider apparently agrees. He testified that in his professional judgment the combination of repeated overnights and days at field offices was not "reasonable, appropriate and adequate" for the affected children. (Tr., p. 613). The program was adequate only in the "context of the current available resources and circumstances we face." (Tr., p. 613).
Concern, however, with the availability of resources is not part of the constitutionally acceptable decision-making process. Society for Good Will to Retarded Children v. Carey, 572 F.Supp. 1298 (E.D.N. Y.), supplemented, 572 F.Supp. 1300 (E.D. N.Y.1983), aff'd in part and rev'd in part, 737 F.2d 1239 (2d Cir.1984). In Thomas S. By Brooks v. Morrow, 601 F.Supp. 1055 (W.D.N.C.1984), the parties agreed that the plaintiff, a mentally retarded and emotionally disturbed individual in the county's custody, should be in a community based treatment facility. Because no facilities were available, however, he was placed in a detoxification center. The court held that the plaintiff was entitled to the placement which professionals determined was appropriate for him. He did not have to settle for one that was merely available. The court stated that:
Lack of funding or of established alternatives is not a factor which may be considered in determining the scope of this constitutional right [to treatment] ... To the extent that a professional's judgment of the appropriate treatment is shown to have been modified to fit what is available, that judgment likely has become a `substantial departure from accepted professional judgment, practice, or standards.'
601 F.Supp. at 1059-60, (quoting Youngberg, 457 U.S. at 323, 102 S.Ct. at 2462).[61]
We conclude that the overnight program violates plaintiffs' constitutional right to conditions which bear a reasonable relationship to the purpose of the City's custody. At a minimum, foster care children have a protectable interest in receiving adequate shelter and treatment while awaiting placement by the Commissioner. Based upon the evidence so far presented, we find that the conditions which necessarily characterize the night-to-night program do not reflect the exercise of professional judgment and are accordingly constitutionally inadequate.
In Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality must "cause" the constitutional violation for it to be held liable in a Section 1983 action. Causation exists in two situations: (1) where, as in Monell, implementation of a municipal policy compels the constitutional violation, and (2) where the causation test in (1) is not met and the constitutional violation by the municipal employee(s) occurs through gross negligence amounting to "deliberate indifference." Fiacco v. City of Rensselaer, 783 F.2d 319, 326 (2d Cir.1986). In general, if there has been intentional deprivation, the first test is implicated and "deliberate indifference" need not be shown. In such a case, all the law requires is that the defendants generally intended to do the act and could reasonably foresee the injury that resulted. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).
*1185 The City has argued that the due process clause is not implicated, even where there has been a deprivation of liberty, where the conduct of the official causing the deprivation is merely negligent. (Def.Br. on First Motion, p. 5). It goes on to assert that plaintiffs must prove a mental state of "deliberate indifference" by the involved officials. The City has accurately outlined the second type of causation applicable to municipal liability in Section 1983 actions. However, proving this second type of causation is only necessary where the first, direct type of causation does not exist. This is a case of direct causation.
This is not a case in which specific employees are charged with violating municipal policies. SSC has intentionally implemented affirmative policies and practices which have condemned children to substandard shelter and treatment. These practices implicate the plaintiffs' due process liberty rights. Further, as required by Monroe, the defendants could reasonably be expected to have foreseen the harm that resulted from their decisions to keep children in offices during the day and send them to shelters at night on an extended basis.
Defendants claim that they could not have predicted the shortage of foster care facilities which provoked their reliance upon the night-to-night program. They further claim that they could not have predicted the increased demand for placements which occurred during the last year, after the institution of this lawsuit and the July Hearing. According to the defendants the original shortage was caused by three factors. First, a long-term trend of declining demand for foster care placement reversed itself in 1985.[62] Second, defendants experienced a "normal seasonal increase" during the first quarters of 1985 and 1986. Third, more children were entering the system with special need and were therefore "hard to place."
Defendants acknowledge that SSC's Plan for the Expansion of the Foster Care System, Fiscal Years 1987-1988 (the "Plan") underestimated the increase in the foster care population for fiscal year 1987.[63] They attribute their failure to accurately project the demand for placements to (1) the increase in the number of infants born with drug withdrawal symptoms and (2) the increase in the number of abuse and neglect cases. (August 21, 1987 Courtney Aff., ¶ 15).
If these have been the problems, they were reasonably foreseeable. The record indicates that the reversal of the "long-term" trend of declining demand for foster care was largely caused by a substantial increase in the number of abuse and neglect petitions requesting removal brought by SSC. As for seasonable swings, if they are "normal," they are predictable. With respect to the system's ability to provide for special needs, the fundamental purpose of the foster care system is to provide a temporary home for just such children. Regarding infants born with drug withdrawal symptoms, defendants have themselves pointed out that this suit does not involve border babies.

Irreparable Injury
"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11 C. Wright and A. Miller, Federal Practice and Procedure, § 2948 at 440 (1973). Given the inadequate conditions which characterize the night-to-night program, and the deterioration suffered by repeat overnighters, which likely cause a violation of the childrens' due process rights, we find that plaintiffs have met the irreparable harm requirement for even mandatory relief.

*1186 CONCLUSION
By effectively transforming a portion of the City's foster children into homeless children while they await placement, the City has evolved a program not reasonably related to the purpose for which the defendants obtained custody. The City's failure to exercise professional judgment in the provision of adequate shelter and treatment to overnighters has deprived them of liberty without due process of law. Accordingly, we find that the plaintiff class is entitled to preliminary injunctive relief.
The parties are instructed to jointly submit a briefing schedule on the question of remedy by October 15, 1987.
Plaintiffs will be permitted to supplement their complaint insofar as they allege the unconstitutionality of conditions imposed upon class members at the foster care facilities to which they are sent overnight. Plaintiffs may further supplement their prayer for relief to remedy those conditions. Plaintiffs' motion to supplement the complaint is denied in all other respects.
Plaintiffs' motion to compel discovery is granted to the extent that their requests relate to conditions which characterize the overnight program or the provision of relief from that program. The motion to compel is otherwise denied.
Plaintiffs' motion to expand the class definition is denied. Plaintiffs' motion for a second preliminary injunction to close East Harlem is denied.
It Is So Ordered.
NOTES
[1] Accordingly, the court exercised its discretion to limit testimony concerning defendants' remedial measures after plaintiff's institution of the lawsuit. That evidence has been submitted by affidavit before and after the hearing. More than one year later, defendants' remedial measures still have not mooted plaintiffs' claim to relief based upon the City's overnight program.
[2] An Agency Operated Boarding Home ("AOBH") is a facility with a home-like atmosphere that can care for up to six children. There are no restrictions on the age of children who can be placed in an AOBH.
[3] Despite their position that the original action covered the Additional Practices, plaintiffs' decision to file a Second Motion for Preliminary Injunction rather than to amend their Renewed Motion has not been explained.
[4] As early as July 2, 1986, the New York State Department of Social Services had ordered that SSC "cease and desist from placing children" at East Harlem. (Plaintiffs' Statement of Outstanding Issues, Exhibit A-Attachment 2). SDSS further ordered the City to move the children that were then accommodated at East Harlem to licensed, certified or approved foster care settings. (Plaintiffs' Statement of Outstanding Issues, Exhibit A-Attachment 2). The City refused to comply with that order. A little over one year later, on July 2, 1987, SDSS again ordered the City to close the East Harlem Facility. (Plaintiffs' Statement of Outstanding Issues, Exhibit A-Attachment 4). The City again refused to comply. (Plaintiffs' Statement of Outstanding Issues, Exhibit A-Attachment 5). On August 3, 1987, SDSS informed defendants that it would bring an action in New York State Supreme Court to close the facility. (Plaintiffs' Statement of Outstanding Issues, Exhibit A-Attachment 6). The State and City then entered into negotiations which resulted in the above described agreement.
[5] A neglected child is:

a child less than eighteen years of age (i) whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care (ii) who has been abandoned ... by his parents or other person legally responsible for his care.
N.Y.Fam.Ct.Act § 1012 (McKinney's 1983).
[6] An abused child is:

A child less than eighteen years of age whose parent or other person legally responsible for his care
(i) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, or
(ii) creates or allows to be created a substantial risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ, or
(iii) commits, or allows to be committed, a sex offense against such child, as defined in the penal law, provided, however, that the corroboration requirements contained therein shall not apply to proceedings under this article.
N.Y.Fam.Ct.Act § 1012 (McKinney's 1983).
[7] A PINS is a child under 16 years old who is truant, incorrigible, ungovernable, habitually disobedient and beyond the lawful control of his parent or other lawful authority or in the unlawful possession of marijuana. N.Y.Fam. Ct.Act § 712(a) (McKinney's 1983). Children who enter foster care as PINS are often reclassified as neglected.
[8] A juvenile delinquent is

a person over seven and less than sixteen years of age, who, having committed an act that would constitute a crime if committed by an adult, (a) is not criminally responsible for such conduct by reason of infancy, or (b) is the defendant in an action ordered removed from a criminal court to the family court pursuant to article seven hundred twenty-five of the criminal procedure law.
N.Y.Fam.Ct.Act, § 301.2 (McKinney's 1983).
[9] State law provides for the voluntary commitment of children to the state for care and custody by means of the execution of a written instrument. N.Y.Soc.Serv.Law § 384-a (McKinney's 1983). Voluntary placement does not terminate parental rights. It should therefore be distinguished from "voluntary surrender," N.Y. Soc.Serv.Law § 384 (McKinney's 1983), which has as its main purpose the termination of parental rights so as to facilitate adoption.
[10] There are two field offices in Brooklyn and one in each of the other boroughs.
[11] According to the plaintiffs, the numbers of overnight "placements" far exceed the number of children who have endured repeated overnights. For example, plaintiffs claim that in April 1986, more than 700 overnight "placements" occurred. The numbers provided by the City are also high. Defendants admit that 358 overnights occurred in March 1986, 421 in April, and 485 in May. The defendants have stated that approximately 60 percent of those children "placed" on an overnight basis had only one overnight prior to receiving a stable placement. (Affidavit of Eric Brettschneider dated July 2, 1986 ("July 2, 1986 Brettschneider Aff."), ¶ 26).
[12] Though Elizabeth Mayberry, who testified for the City at the July 1986 hearing, was involved in negotiating the arrangement with "The Door" day treatment program, she contradicted the estimated numbers given in the proposal. Mayberry testified that there were only 15 to 20 children going to overnight "placements." (Tr., p. 249).
[13] It should be noted that while the statutory classifications are clear, the actual status of a child may not be. Many PINS children are also the subject of abuse and neglect investigations. For purposes of this Opinion, the child has been placed into the group reflecting his or her last known status.
[14] Ages of the children are given as of the time of this court's July 1986 hearing.
[15] The records do not reveal what happened to Ricky between May 2 and May 8.
[16] In the two years prior to this referral, Richard had been the subject of two ECS investigations and reports concerning possible child abuse, which had never resulted in his being removed from home. (Pl.Ex. 57, pp. 2-4).
[17] Faith also spent one night at home. (Pl.Ex. 23, A-17).
[18] The meaning of "correctional facility" in this context is unclear.
[19] Takeesha has been variously characterized by SSC as White, "other than," Spanish, Japanese and Oriental. (Pl.Ex. 27, F-11, 12, 36, 43, 46, 55, 57, 77, 98, 123, 144, 174). Takeesha's father is American Indian. Her mother is Japanese. (Pl.Ex. 27, F-167, 174).
[20] If a report of child abuse is "indicated," the allegations are founded.
[21] One expert testified that this report was questionable from a professional standpoint for improperly putting the onus on the child for her "disruptive" conduct. Placing an eight year old with a fifteen year old, he stated, was the reason for the incident. He testified that it clearly constituted sexual abuse, rather than sexual play. (Tr., p. 443).
[22] John's mother abandoned him and his three brothers in the Bronx Park Motel, leaving no forwarding address. (Tukman Aff., p. 3).
[23] The psychiatric report stated that John defied authority, left the residence and received visitors. Once, when he went AWOL, John was assaulted by three outside youths and required hospitalization. (Pl.Ex. 36, F-263).
[24] It should be noted that on October 23, 1985, a report of Suspected Child Abuse or Maltreatment was filed. The report stated that John had been living on the street since August and that his mother could not care for him since she was in a womens shelter in Queens. (Pl.Ex. 36, F-296). Two weeks later, on November 8, 1985, a second neglect petition was filed because SSC failed to file an "Extension of placement," which had expired on September 19, 1985. (Tukman Aff., pp. 4-5).
[25] We assume that this means that John was at the SSC field office requesting placement.
[26] It is important to note that John had previously done well at Baychester when it was his stable placement. The overnight experience produced a different result.
[27] Dr. Kaplan testified that 36 separate placements would have a debilitating effect, no matter what the child's circumstances. (Tr., p. 454).
[28] There is some confusion regarding the filing of the PINS petition. The Field Office File Summary (Pl.Ex. 33, F-10) notes that a PINS petition was filed in Brooklyn Family Court on May 14, 1985. The documents indexed to the notation in the summary are missing, however, from the copy of the file submitted to the court. Victor's court records indicate that the PINS petition was filed on November 15, 1985 and found to have merit on November 18, 1985. At that time the Family Court remanded Victor to the care of the Commissioner to be placed at St. Christopher's. (Pl.Ex. 31, pp. 1-2).
[29] The SSC records are redundant and incomplete. Moreover, no summary of the number and dates of overnight "placements" were presented to the court pertaining to Victor Coe. (See Pl.Ex. 84). The numbers recited above represent the court's best effort at deciphering the Family Court and SSC records provided regarding Victor Coe.
[30] Dr. Kaplan testified that Haldol is an extremely potent anti-psychotic drug. (Tr., p. 398). He stated that adolescent males should not receive Haldol except in extreme cases of psychosis. (Tr., p. 419-432). He further revealed that the drug has significant side effects ranging from muscle rigidity to tardive dyskinesia. Dr. Kaplan also informed the court that the administration of Haldol should be medically supervised and limited in time and scope.
[31] Apparently, QSPCC is the same as Queensboro Diagnostic. (See Pl.Ex. 48, F-71).
[32] Several other actions involving some of the Additional Practices, and encompassing members of plaintiffs' proposed new class, have already been commenced. See Jane B. v. New York City Department of Social Services, 87 Civ. 2470 (PKL); see also Baby Jennifer v. Koch, 86 Civ. 9676 (VLB).
[33] This court has not yet determined whether a mandatory injunction will be necessary or appropriate in this case. A finding of entitlement to injunctive relief might result in an order restricting the entry of children into the foster care system's overnight program. It is also possible that such a finding would result in a mandatory order requiring the City to develop additional facilities in which to care for overnighters. In any case, the parties will be asked to brief those issues. Plaintiffs must therefore be permitted discovery relating to a potential mandatory order.
[34] Article XVII, § 1 of the New York State Constitution provides:

The aid care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine.
[35] With regard to Pennhurst, the defendants agree that DSS is a local agency and that Gross and Brettschneider are local or county officials. They argue, however, that the local and state social service systems are so intertwined that no effective judgment could be rendered without the cooperation of the state. Plaintiffs persuasively contend in their response that under N.Y. Social Services Law §§ 395 and 76, the local social services district is responsible for the welfare of the children in its custody regardless of whether the state reimburses it for its costs in meeting childrens' needs. Jones v. Berman, 37 N.Y.2d 42, 55, 371 N.Y.S.2d 422, 332 N.E.2d 303 (1975).

With respect to abstention, we do not believe it is appropriate in this case. "While the conduct attributed to defendants may violate state law, this does not foreclose consideration of the federal constitutional claims where the same conduct infringes upon federal constitutional rights." Child v. Beame, 412 F.Supp. 593, 600 (S.D.N.Y.1976). The cases cited by defendants, Cannaday v. Valentin, 768 F.2d 501 (2d Cir. 1985) (state cases pending at time of federal abstention), New York State Association of Retarded Children v. Carey, 727 F.2d 240 (2d Cir. 1984) and Pineman v. Oechslin, 637 F.2d 601 (2d Cir.1981) are inapposite.
[36] Prison inmates have a constitutional right to decent and humane conditions derived from the Eighth Amendment's proscription against cruel and unusual punishment, Estelle v. Gamble, 429 U.S. 97, 102-04, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976).
[37] The Supreme Court has made it clear that the foundation of the juvenile justice system is its proscription against punishment and retribution as permissible objectives. In Kent v. United States, 383 U.S. 541, 554, 86 S.Ct. 1045, 1054, 16 L.Ed.2d 84 (1986), the Court said the objectives of the juvenile justice system "are to provide measures of guidance and rehabilitation for the child ... not to fix criminal responsibility, guilt and punishment."
[38] There is earlier case law to support the view that foster care childrens' liberty interests are implicated simply by virtue of the state's custody. In a case involving a PINS child, the district court held "[w]here the State, as parens patria, imposes ... detention, it can meet the Constitution's requirement of due process and prohibition of cruel and unusual punishment if, and only if, it furnishes adequate treatment to the detainee." Martarella v. Kelley, 349 F.Supp. 575, 585 (S.D.N.Y.1972).
[39] In Bell, the Supreme Court stated the test for determining whether a particular condition amounts to punishment:

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose ... Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on `whether an alternative purpose to to which [the restriction] may rationally be connected is assignable for it and whether it appears excessive in relation to the alternative purpose assigned [to it].'
441 U.S. at 538, 99 S.Ct. at 1873 (citations omitted). The Court also considered the impact of the imposed conditions and said that a due process violation may occur where they cause "genuine privations and hardship over an extended period of time ..." Bell, 441 U.S. at 542, 99 S.Ct. at 1875.
[40] A court must decide whether the disability is imposed for the purpose of punishment or is an incident of another legitimate governmental purpose.
[41] See also Society for Good Will, 737 F.2d at 1250-51 n. 6; Youngberg, 457 U.S. at 325-26, 102 S.Ct. at 2463 (Blackmun, J., concurring).
[42] Stevens testified that his unit is one of six which make up the Office of Placement and Accountability (known in the Department as "Allocations.") (Tr., pp. 196, 206). One of the units is a special placement unit for "kids with special problems." (Tr., p. 206).
[43] Stevens testified that SSC did not keep records of overnights (as distinct from "regular" replacements) until May 1985. The voluntary units began keeping records of replacements collectively in the beginning of 1985. Prior to that time, only the court placement units (those who placed children after a remand from the Family Court) kept track of replacements because the "PINS and the D's were replaced more often than the voluntary kids." (Tr., p. 203).
[44] Mayberry, who testified as an expert in social work but is not a doctor, stated that in her opinion while the night-to-night placement experience may cause deterioration in children who are severely mentally disturbed, it does not cause long-term harm in other children in foster care. (Tr., pp. 290-295). She also testified that children on overnights who have made "a commitment" to a congregate care facility, suffer "repeated separation and change." (Tr., p. 357). Similarly, where there is "commitment" to a facility, replacement "reactivates ... and reinforces previous separation and rejection experiences and tends to confirm for the child any predisposition he may have to regard himself as unacceptable to others." (Tr., p. 357).
[45] The Family Court has exclusive jurisdiction over PINS proceedings, N.Y.Fam.Ct.Act § 713, which are originated by filing a petition "specifying the acts on which the allegations are based and the time and place they allegedly occurred, N.Y.Fam.Ct.Act § 732(a). Once the proceeding is before the court, a fact finding hearing is held to determine whether the child's acts fit within the PINS definition of § 712(a) of the Family Court Act. Following completion of the fact finding hearing a dispositional hearing must be held. If the allegations of the PINS petition are established, the court will enter an order adjudicating the child a PINS. N.Y.Fam.Ct.Act § 752. Despite the existence of the fairly elaborate procedure, the Family Court records of the children submitted to this court indicate that months go by without the occurrence of a fact-finding or dispositional hearing. Under § 754, subd. 1(c) of the Family Court Act, a PINS proceeding may be continued and the child remanded to the Commissioner's custody pending the adjourned date. N.Y.Fam.Ct.Act § 756.
[46] Where the child has not committed a designated felony act, the Family Court is under an obligation to order the least restrictive available alternative consistent with the aforementioned standard. N.Y.Fam.Ct.Act § 352.2(2) (McKinney's 1983). If the juvenile is placed with the Commissioner and he is unable to place him the Commissioner must either apply to the Family Court for a stay or modification of the dispositional order or return the child to Family Court for a new dispositional hearing and order. N.Y. Fam.Ct.Act § 353.3(2)(a) and (b) (McKinney's 1983). This could result in a more restrictive placement.
[47] The New York State courts have also commented on the right of juvenile delinquents to treatment. See Matter of Quinton A., 49 N.Y.2d 328, 425 N.Y.S.2d 788, 402 N.E.2d 126 (1980); Sinhogar v. Parry, 74 A.D.2d 204, 427 N.Y.S.2d 216, 222-23 (1st Dept.1980). Neither of these cases, however, holds that juvenile delinquents have a federal constitutional right to treatment.
[48] Children in voluntary placements have a right to "adequate care" which is derived from N.Y.Soc.Serv.Law §§ 395, 398, subd. 2(b). See, e.g., Sinhogar v. Parry, 427 N.Y.S.2d at 222. Sinhogar did not find a statutory right to treatment. That case, however, was decided prior to the imposition of a statutory obligation to provide "preventive services" with respect to voluntary placements. The court has found no case addressing the question of whether that new obligation creates a statutory right to treatment. It is worth noting that in his dissent in Sinhogar, Justice Fuchsberg would have found that foster children had a constitutional liberty interest in family integrity and beneficial nonarbitrary treatment. Sinhogar, 442 N.Y.S.2d at 444 (Fuchsberg, J. dissenting). Moreover, in Society for Good Will, 737 F.2d at 1250, the Second Circuit did not distinguish between the treatment rights of voluntarily and involuntarily committed individuals to state schools for the mentally retarded.
[49] Though Youngberg addressed liberty interests in safety and freedom from unreasonable restraint, we believe that deference to the exercise of professional judgment with respect to all of the challenged conditions of plaintiffs' custody is appropriate. The criteria have been applied in a variety of contexts. See Bell v. Wolfish, 441 U.S. 520 [99 S.Ct. 1861, 60 L.Ed.2d 447] (1979); Parham v. J.R., 442 U.S. 584 [99 S.Ct. 2493, 61 L.Ed.2d 101] (1979); Regents of University of Michigan v. Ewing, 474 U.S. 214 [106 S.Ct. 507, 88 L.Ed.2d 523] (1985).
[50] It may be true, as Ms. Betty Green, training supervisor for SSC's Placement Division, testified, that "you don't have to have letters to understand when someone is being damaged emotionally and physically and they are ... you don't have to have a degree to understand when a situation is inhuman." (Tr., p. 227). This court recognizes, however, that it should not "`second-guess the expert administrators on matters on which they are better informed.'" Youngberg, 457 U.S. at 323, 102 S.Ct. at 2462 (quoting Bell, 441 U.S. at 544, 99 S.Ct. at 1877).
[51] In their First Motion for preliminary relief, plaintiffs additionally challenged the adequacy of food, medical care, education, recreation and diagnostic treatment provided to children awaiting placement on the overnight program. As a result of the Interim Settlement Agreement, those problems have apparently been addressed. The inadequacy of those conditions remain relevant for purposes of determining whether a constitutional violation has occurred and are mooted only in relation to the imposition of remedial measures. In view of our finding based on the inadequacy of shelter and treatment which is an inherent part of the overnight experience, we need not consider those other conditions here.
[52] The record indicates that while some unidentified children may have been forced to wear the same or dirty clothes for several days, plaintiffs have not shown that this is a common or general occurrence. Mayberry testified that day and night supervisors have money to purchase clothing if necessary and that donated clothing and "some shirts" are available for teenagers at the field offices. Deallie testified that she has used such money to purchase clothing for children on some occasions.

Accordingly, we find that there has been no showing that plaintiffs are likely to prove constitutional inadequacy with respect to SSC's provision of clothing to overnighters.
[53] Where visits by experts occurred after suit was instituted, those descriptions are included. Changes resulting from the Interim Settlement Agreement have not been included. For purposes of determining whether conditions were constitutionally adequate, the defendants' remedial measures are not relevant. Remedial measures will be considered (1) insofar as they were taken prior to the litigation in connection with the defendants' state of mind; and (2) for the purpose of framing an appropriate remedy.
[54] Ricky Doe had seen between three and 13 other children per day waiting at the Brooklyn field office for placement. (May 19, 1986 Firestein Aff., ¶ 11).
[55] Dr. Levitt testified that when he visited the basement on June 26, 1986, there were two large pedestal fans. One of them was out of order and one was making tremendous noise "so much so that when I spoke to one of the children I was about 12 inches away to make myself heard." (Tr., p. 116).
[56] Mayberry testified that in May 1986, there was no television in the adolescent holding room. Nor had she seen books or magazines there. (Tr., p. 314).
[57] Children as old as twelve were kept in the nursery. (Tr., p. 298).
[58] In fact, many of the children whose stories have been revealed to this court frequently go AWOL, disappearing for weeks with no indication that SSC or anyone else knows where they are, reportedly living on the street. The children themselves come to feel that they are homeless. (See Background section of this Opinion, pp. 36-42).
[59] The Commissioner is the official who has final authority on decisions which implement City foster care policy so as to make his decisions official policy. Rookard v. Health and Hospitals Corp., 710 F.2d 41 (2d Cir.1983).
[60] Dr. Shepherd also reported that the number of toileting facilities at the Bronx field office violated medically acceptable standards. (Tr., p. 686).
[61] This is not to say that availability of resources should not be considered on the question of damages. "In an action for damages against a professional in his individual capacity, however, the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good faith immunity would bar liability." Youngberg, 457 U.S. at 323, 102 S.Ct. at 2462.
[62] Defendants contend that between 1980 and 1985 the foster care system shrunk as a result of the enactment of New York State's Child Welfare Reform Act of 1979. That act provided funds for preventive services to help keep families together. It also increased the emphasis on permanency planning for children in foster care.
[63] The defendants predicted a one percent increase over 1986. In actuality, a six percent increase occurred. (August 21, 1987 Courtney Aff., ¶ 14).